**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| ABINGTON MEMORIAL HOSPITAL, *et al.*, | ) ) ) |  |
| Plaintiffs, | ) ) ) |  |
| v. | ) ) ) | Civil Action No. 13-cv-1765 (KBJ) |
| SYLVIA MATHEWS BURWELL, *in her* *official capacity as* Secretary of the United States Department of Health and Human Services, | ) ) ) ) ) ) |  |
| Defendant. | ) ) |  |

<u>**MEMORANDUM OPINION**</u>

With its enactment of the Medicare Act in 1965, Congress created a complex national system that insures healthcare services for the elderly and the disabled. The Secretary of the Department of Health and Human Services ("HHS") administers the Medicare program through the Centers for Medicare & Medicaid Services ("CMS"), *see* 42 U.S.C. §§ 1395ff(a)(1), 1395hh(a)(1), and CMS employs the Prospective Payment System ("PPS") to reimburse hospitals for the inpatient medical services that they provide to Medicare beneficiaries, *see id.* § 1395ww(d); *Anna Jacques Hosp. v. Burwell*, 797 F.3d 1155, 1157–58 (D.C. Cir. 2015); *Cape Cod Hosp. v. Sebelius*, 630 F.3d 203, 205 (D.C. Cir. 2011). PPS reimbursements are pegged to a complicated formula that requires the Secretary to account for a hospital's wages and wage-related costs, such as salaries, health insurance, and pension plans. Moreover, because such

wage-related costs can vary across geographic areas, Congress has required the Secretary to adjust PPS payments regionally based on a wage index that the agency calculates annually using data that regional hospitals report to HHS and its agents. The direct relationship between the wage index and PPS reimbursement payments often spawns litigation regarding how the index is calculated; the instant matter is one such case. Plaintiffs are a large group of inpatient hospitals that believe the PPS payments that HHS made to them were improper primarily due to certain allegedly inappropriate changes that the Secretary made that affected the wage-index calculation, beginning in 2005.

Plaintiffs' primary bone of contention is with a final rule that HHS proposed in May of 2005 and promulgated in August of 2005. *See Medicare Program; Changes to the Hospital Inpatient Prospective Payment Systems and Fiscal Year 2006 Rates* (the "2005 Final Rule"), 70 Fed. Reg. 47,278, 47,278 (Aug. 12, 2005). The 2005 Final Rule altered how certain labor-related data is to be reported and calculated for the purpose of creating the wage index. According to Plaintiffs, the proposal for this rule provided insufficient notice of the changed methodology, the change itself was insufficiently explained and inherently contrary to the Medicare statute, and the 2005 Final Rule ultimately resulted in the agency's creation of defective regional wage indices because the HHS agents that collect and evaluate the wage data hospitals submit applied the Secretary's policies erratically. Plaintiffs also challenge the Secretary's decision to change certain wage-related nomenclature in an important Medicare handbook in 2008: they argue that HHS failed to employ required notice-and-comment procedures when it issued "Transmittal 436" (the memorandum that effectuated the handbook changes).

Plaintiffs further allege that HHS ultimately applied both the 2005 Final Rule and the Medicare handbook changes in an impermissibly retroactive manner, because the agency applied those new policies when it evaluated certain data that Plaintiffs had submitted long before the rule and handbook changes became operative.

Before this Court at present are the parties' cross-motions for summary judgment.  (*See* Pls.' Mot. for Summ. J. ("Pls.' Mot."), ECF No. 14; Def.'s Cross-Mot. for Summ. J. & Opp'n to Pls.' Mot. for Summ. J. ("Def.'s Mem."), ECF No. 16.)  On September 30, 2016, this Court issued an Order in which it **DENIED** Plaintiffs' summary judgment motion and **GRANTED** the Secretary's cross-motion.  (*See* Order, ECF No. 25.)  This Memorandum Opinion explains the reasons for that order.  In short, and as explained fully below, this Court rejects Plaintiffs' myriad assertions regarding the agency's alleged production of deficient regional wage indices after the Secretary's rule change in 2005, and it also concludes that the application of the wage indices that the agency used to generate Plaintiffs' PPS payments between 2007 and 2011 did not have an impermissibly retroactive effect.

## I.   BACKGROUND

### A.   Medicare Payments, The PPS Scheme, And The Manner In Which HHS Creates And Uses Regional Wage Indices

#### 1.   Medicare Payments For Inpatient Hospital Care Are Based On Fixed Rates That Are Set Prospectively And Adjusted For Regional Variations In Labor-Related Costs

The rise of the PPS reimbursement system, which is the federal government's current scheme for paying hospitals for inpatient services rendered to Medicare beneficiaries, has been well-documented.  *See, e.g.*, *Anna Jacques Hosp.*, 797 F.3d at 1158–59; *Cape Cod Hosp.*, 630 F.3d at 205; *Clarian Health West, LLC v. Burwell*, No.

14-339, 2016 WL 4506969, at *2 (D.D.C. Aug. 26, 2016).  In short, until 1983, reimbursements for inpatient medical care for Medicare beneficiaries who required at least a one-night stay in the hospital "were based on the 'reasonable costs' of [the] inpatient services" actually provided, so long as those costs fell within certain limits. *Methodist Hosp. of Sacramento v. Shalala*, 38 F.3d 1225, 1227 (D.C. Cir. 1994) (citing 42 U.S.C. § 1395f(b)); *see also* 42 U.S.C. § 1395ww(d)(1)(B) (defining class of covered hospitals); *Anna Jaques Hosp. v. Sebelius*, 583 F.3d 1, 2 (D.C. Cir. 2009).  This meant that hospitals had little *ex ante* incentive to keep costs low, and that Medicare costs escalated as hospital costs increased.  *See Methodist Hosp.*, 38 F.3d at 1227.  But Congress overhauled the cost-based system for inpatient hospital care in 1983; the new reimbursement scheme that Congress adopted—the PPS—is a system that "relies on prospectively fixed rates for each category of treatment rendered." *Id.* (citing Social Security Amendments of 1983, Pub. L. No. 98–21, § 601, 97 Stat. 65, 149 (1983)).  The PPS system "improve[s] efficiency and reduce[s] operating costs" because hospitals are given advance notice of the pre-established rates at which inpatient services will be reimbursed and are ultimately reimbursed at those pre-set rates, irrespective of the costs the hospital actually incurs.  *Id.*; *see also Anna Jaques Hosp.*, 797 F.3d at 1157–58 (citing 42 U.S.C. § 1395ww(d)).

Notably, the prospectively set rates that hospitals are paid under the PPS scheme "are tied to the national average cost of treating a patient in a particular 'diagnosis-related group' (DRG)." *Southeast Ala. Med. Ctr. v. Sebelius*, 572 F.3d 912, 914 (D.C. Cir. 2009) (quoting 42 U.S.C. § 1395ww(d)).[1]  The national average cost of treating

---

[1] DRGs reflect the disparate resources required to treat various illnesses; "[t]he more complicated and costlier the treatment is, the greater the weight assigned to that particular DRG will be." *Cty. of Los*

patients in a given DRG is a "standardized amount[,]" *Cape Cod Hosp.*, 630 F.3d at 205; however, Congress has recognized that the costs of treating patients can vary regionally based on the relative costs of labor in various parts of the country, so the Medicare statute requires HHS to adjust PPS payments to smooth out regional differences related to such costs, *see* 42 U.S.C. § 1395ww(d)(3)(E)(i) (stating that "the Secretary shall adjust the proportion, (as estimated by the Secretary from time to time) of hospitals' costs which are attributable to wages and wage-related costs, of the DRG prospective payment rates . . . for area differences in hospital wage levels").  In fact, a "significant component" of the PPS payment that a qualifying inpatient hospital receives for treating Medicare beneficiaries relates to "'wages and wage-related costs[,]'" *Anna Jaques Hosp.*, 583 F.3d at 2 (quoting 42 U.S.C. § 1395ww(d)(3)(E)(i)) —which are collectively referred to as a hospital's "labor-related share," *Southeast Ala. Med. Ctr.*, 572 F.3d at 914–15—and, therefore, the prospective payment amounts that HHS pays to hospitals that provide inpatient treatment for similar Medicare beneficiaries can vary significantly by region.  The instant case concerns the mechanism by which the Secretary calculates the labor-related variable that it applies to the national average cost when the reimbursement amount due to a particular hospital is determined.

     **2.**  <u>HHS Creates And Applies Regional Wage Indices To Ensure Equitable Nationwide PPS Payments</u>

Per the Medicare statute, the required labor-related adjustment to the national average cost of treating a patient in a particular DRG must be made "by [employing] a

---

*Angeles v. Shalala*, 192 F.3d 1005, 1008 (D.C. Cir. 1999); *see also Cape Cod Hosp.*, 630 F.3d at 205–06.

factor (established by the Secretary) reflecting the relative hospital wage level in the geographic area of the hospital compared to the national average hospital wage level." 42 U.S.C. § 1395ww(d)(3)(E)(i).  "HHS has traditionally referred to . . . [this] 'factor' . . . as the 'wage index.'"  *Southeast Ala. Med. Ctr.*, 572 F.3d at 914–15.  It is critically important to understand the symbiotic relationship that exists between hospitals and HHS with respect to the creation and application of the regional wage indices: generally speaking, HHS creates the required regional indices based on wage-related data that the agency gleans from cost reports that hospitals submit when they seek Medicare reimbursements, and then, once the indices are created (which can take years, as explained below), HHS applies the regional wage indices to the cost reports that hospitals submit regarding their expenses in order to determine the particular prospective amounts that are paid to individual hospitals for the eligible services they provide in a given fiscal year.  Of course, as with many complex systems, the devil is in the details, which can be described generally as follows.

### a.  How The Wage Indices Are Created

By statute, the Secretary develops new wage indices annually and by region "on the basis of a survey . . . of the wages and wage-related costs of subsection (d) hospitals in the United States."  42 U.S.C. § 1395ww(d)(3)(E)(i); *see also Anna Jacques Hosp.*, 797 F.3d at 1158.[2]  The survey reflects wage information that is derived from the cost reports that hospitals submit every year to "Medicare administrative contractors" ("MACs"), which are private entities that are also known as "intermediaries" and that act as the Secretary's agents for the purpose of calculating PPS payments.  *See*

---

[2] "Hospitals that participate in the PPS are called 'subsection (d) hospitals[.]'" *Anna Jacques Hosp.*, 583 F.3d at 2 (citation omitted).

*Palisades Gen. Hosp. Inc. v. Leavitt*, 426 F.3d 400, 401 (D.C. Cir. 2005).  For the

purpose of the creation of the wage indices, the relevant information dwells in a portion

of a hospital's cost report called "Worksheet S-3," which solicits detailed data about the

wages the hospital paid, its wage-related costs, and the hours its employees worked

during a particular reporting period.  *Regents of the Univ. of Cal. v. Burwell*, 155 F.

Supp. 3d 31, 38 (D.D.C. 2016); *see* 2005 Final Rule, 70 Fed. Reg. at 47,373.

The wage indices are developed based on a multistep process.  *See, e.g.*,

*Medicare Program; Changes to the Hospital Inpatient Prospective Payment Systems*

*and Fiscal Year 2007 Rates* ("FFY 2007 PPS Changes"), 71 Fed. Reg. 47,870, 48,016

(Aug. 18, 2006) (describing the process).  First, the MACs audit the data that the

hospitals provide in their cost reports in order to ensure that it complies with all

applicable formatting requirements before it is passed on to the Secretary.  *See Regents*

*of the Univ. of Cal.*, 155 F. Supp. 3d at 41–42; *Owensboro Health, Inc. v. Burwell*, No.

14-95, 2016 WL 4361527, at *5 (W.D. Ky. Aug. 12, 2016); *Parkview Med. Assocs., L.P*

*v. Shalala*, No. 94-1941, 1997 WL 470107, at *10 (D.D.C. Aug. 13, 1997), *aff'd*, 158

F.3d 146 (D.C. Cir. 1998); 2005 Final Rule, 70 Fed. Reg. at 47,369, 47,372, 47,384;

(*see also* Compl., ECF No. 1, ¶ 10).  Then—after the MACs inform the hospitals of "the

results of their review" and the hospitals respond, FFY 2007 PPS Changes, 71 Fed. Reg.

at 48,016—the Secretary "scrubs" the data that the MACs forward to the agency,

removing data "that fail to meet certain criteria for reasonableness, including data that

are 'incomplete[,] inaccurate . . . , or otherwise aberrant[,]'" *Anna Jaques Hosp.*, 583

F.3d at 3 (quoting *Medicare Program; Changes to the Hospital Inpatient Prospective*

*Payment Systems and Fiscal Year 2005 Rates*, 69 Fed. Reg. 48,916, 49,049 (Aug. 11,

2004)) (first and second alterations in original); *see also* 2005 Final Rule, 70 Fed. Reg. at 47,372 (describing the post-intermediary removal of data).  The Secretary then compares the average hourly wage of the hospitals in each region of the country against the national average hourly wage, and thereby computes each region's wage index. And once this lengthy wage-data collection and cleaning process is done, the Secretary publishes for public comment a proposed rule that includes the updated wage indices, which is followed by the agency's publication of a final rule that contains the particular wage indices that will govern the PPS payments that will be calculated and distributed during the next fiscal year.  *See Anna Jacques Hosp.*, 797 F.3d at 1159; *see also Southeast Ala. Med. Ctr.*, 572 F.3d at 914 (confirming that the Secretary updates the wage index annually, through notice-and-comment rulemaking).

Significantly for present purposes, because this complex process takes time, the set of regional wage indices that the Secretary promulgates each year is based on wage data from cost-reporting periods that took place several years (generally three or four years) prior.  *See Regents of the Univ. of Cal.*, 155 F. Supp. 3d at 38; *see also Anna Jaques Hosp.*, 583 F.3d at 3; 2005 Final Rule, 70 Fed. Reg. at 47,368 (explaining that the federal fiscal year 2006 wage index was based on cost reports for reporting periods beginning in federal fiscal year 2002); (Compl. ¶ 68 ("The . . . determinations regarding the [fiscal year] 2006–2011 wage indices were based upon data gleaned from Hospitals' cost reports for [fiscal years] 2002–2007, respectively.")).  Furthermore, because the agency updates the wage index on an annual basis, the MACs must take care to use the applicable wage index for the relevant fiscal period when they undertake to calculate

8

the prospective payments that will be made to a hospital for any given fiscal year, as explained below.

### b.  How The Wage Indices Are Applied

A bird's eye view of the manner in which the MACs use the regional wage indices to calculate PPS payments brings individual hospital cost reports, once again, into focus.  "At the end of its fiscal year, a hospital submits to its intermediaries a cost report setting forth all costs for which it claims reimbursement[,]" and it is "[b]ased on these costs and the hospital's wage index[ that] the fiscal intermediary calculates the amount of reimbursement due to the hospital."  *Palisades Gen. Hosp.*, 426 F.3d at 401; *see also* 42 C.F.R. § 405.1801(b)(1) ("In order to be paid for covered services furnished to Medicare beneficiaries, a provider must file a cost report with its contractor[.]"); *id.* §§ 405.1801(a), 413.24(f).  When it comes time to pay, the Secretary (through her agents) uses the pertinent regional wage index to "adjust" the portion of the base payment rate that corresponds to the hospital's labor-related share.  42 U.S.C. § 1395ww(d)(3)(E)(i); *see also Cape Cod Hosp.*, 630 F.3d at 205–06; *Palisades Gen. Hosp.*, 426 F.3d at 401; *Anna Jacques Hosp.*, 797 F.3d at 1159; *Southeast Ala. Med. Ctr.*, 572 F.3d at 914–15.  This adjustment essentially entails multiplying the hospital's labor-related share by the applicable regional wage index factor.  *See Cape Cod Hosp.*, 630 F.3d at 205–06.  Then, that adjusted labor-related share replaces the "standardized" labor-related share in the summation of the hospital's total operating expenses for purposes of the complex PPS payment calculation that determines the amount the hospital is paid.  *See id.* at 206.

With respect to the matter of identifying *which* wage index is to be used to calculate a hospital's PPS payments for a given fiscal year, it is important to note that

hospital cost-reporting periods are not necessarily coextensive with the *federal* fiscal year, which runs from October 1st of the calendar year preceding the fiscal year to September 30th of the next (*e.g.*, federal fiscal year 2007 ran from October 1, 2006 to September 30, 2007).  *See* 42 C.F.R. § 51.2.  Accordingly, with exceptions not relevant here, hospitals receive PPS payments based on the wage index in effect during the federal fiscal year when the inpatient discharge for which the hospital seeks reimbursement occurred.  *See, e.g.*, 2005 Final Rule, 70 Fed. Reg. at 47,368; 42 C.F.R. § 412.64(a).[3]

This all means that hospital cost reports serve at least two relevant functions: they provide the information pursuant to which HHS doles out PPS payments for inpatient treatment that a particular hospital provides to Medicare beneficiaries during a given fiscal year, and they also add to the data set that the agency uses to construct future wage indices, which, in turn, will impact the PPS reimbursement amounts that are tendered to hospitals in future years.  *See Kaiser Found. Hosps. v. Sebelius*, 708 F.3d 226, 228 (D.C. Cir. 2013); *Palisades Gen. Hosp.*, 426 F.3d at 401; *see also* 42 C.F.R. § 405.1803.  Thus, inpatient hospitals are understandably interested in the process by which HHS constructs and applies the regional wage indices, and they generally proceed in the hope that the wage data the agency gathers from the cost reports will be used to create indices that will yield the highest possible reimbursement amount in the future.  *See, e.g.*, *Southeast Ala. Med. Ctr.*, 572 F.3d at 915 & n.4 (giving example).  Moreover, because the process described above depends in large part on a

---

[3] Thus, unless otherwise noted, references herein to PPS payments for a "fiscal year" relate to the pertinent federal fiscal year, and not necessarily the calendar year or the hospital's cost-reporting period.

hospital's self-reporting of its own labor-related share, hospitals necessarily spend considerable time and energy on ensuring that their wages and wage-related costs are accurately measured and reported.

### B.     The Secretary's Changing Wage-Index Rules And Guidance

The dispute in this case stems from certain actions the Secretary took, beginning in 2005, that allegedly affected the wage indices that the MACs applied when Plaintiffs submitted their cost reports seeking PPS payments in federal fiscal years 2007 through 2011.  In order to understand the agency's rule changes and Plaintiffs' arguments about them, one must have some knowledge of the prior state of affairs—i.e., the governing standards before 2005.

### 1.   The Wage Reporting Rules In Effect from 1995 to 2005

#### a.  The 1994 Final Rule

In 1994, the Secretary promulgated a final rule that addressed "the amounts and factors necessary to determine prospective payment rates for Medicare hospital inpatient services for operating costs and capital-related costs"; as relevant here, the 1994 Final Rule specifically required inpatient hospitals "to follow Generally Accepted Accounting Principles (GAAP) in developing . . . wage-related costs" for the Worksheet S-3.  *Medicare Program; Changes to the Hospital Inpatient Prospective Payment Systems and Fiscal Year 1995 Rates* ("1994 Final Rule"), 59 Fed. Reg. 45,330, 45,330, 45,357 (Sept. 1, 1994).  This change affected the range of permissible methods of reporting pension costs when the hospitals reported wage-related costs on their worksheets.  *See Regents of the Univ. of Cal.*, 155 F. Supp. 3d at 41 (explaining that, "under GAAP, there are differing—indeed, conflicting—rules pertaining to the

11

reporting of pension costs depending on the set of standards applied"); *see also id.* n.3
(observing different "GAAP" standards for pension reporting); *cf. Shalala v. Guernsey
Mem'l Hosp.*, 514 U.S. 87, 101 (1995) (observing the indeterminacy of GAAP).[4]  And
the 1994 Final Rule also explicitly rejected the idea that "applicable Medicare
principles (which may differ from GAAP)" should govern; the Secretary explained that
it was the agency's view that GAAP would "more accurately reflect relative labor costs,
because certain wage-related costs (such as pension costs) as recorded under GAAP
tend to be more static from year to year."  59 Fed. Reg. at 45,357.  Thus, adopting
GAAP would likely avoid large annual "swings in these costs," thereby preventing a
situation in which the "wage index . . . does not accurately reflect relative labor costs."
*Id.*

  Although the changes in this rule generally applied after October 1, 1994—i.e.,
for federal fiscal year 1995—the Secretary explained that the GAAP adoption would not
go into effect until federal fiscal year 1999.  *See id.* at 45,330, 45,359.  This
determination was made for three reasons: (1) the "data necessary to institute [the]
changes immediately [were] not available"; (2) it had been agency policy "not to apply
policy changes retroactively" and it would be unfair to require hospitals to
"retroactively revise their recordkeeping systems to accommodate these changes"; and

---

[4] Defendant maintains that using GAAP permitted hospitals to report pension costs for a given period
even if those costs were not actually liquidated, as opposed to permitting hospitals to report only costs
that had actually been funded.  (*See* Def.'s Mem. at 17–18 ("[U]nder [another, non-GAAP form of
reporting], pension costs may be reported for a given period only if the costs reflect actual
expenditures, *i.e.*, that the pensions are actually funded, with those costs liquidated and reported within
1 year.  In contrast, under GAAP, pension costs may be reported even without such actual and
immediate funding, because GAAP does not require such funding within any short-term time period as
a condition for recognizing pension costs.").)  Plaintiffs appear to agree with this characterization.
(*See* Pls.' Mem. at 17 (complaining that the 2005 Final Rule meant that hospital "reportable wage-index
Pension Costs were now limited to the amount which had been funded by the hospital during a given
fiscal period (either during the fiscal year or within 12 months of the ending balance sheet date")).)

(3) a delayed implementation would "allow[] time for hospitals that m[ight] be adversely affected to adjust their fiscal plan." *Id.* at 45,359.

### b. The 1995 Final Rule

Just under a year later, the Secretary promulgated a final rule in a slightly different context that is significant for present purposes because it addressed HHS's view of GAAP and Medicare accounting principles as they relate to the reporting of costs. *See Medicare Program; Clarification of Medicare's Accrual Basis of Accounting Policy* ("1995 Final Rule"), 60 Fed. Reg. 33,126, 33,126 (June 27, 1995); *see also Regents of the Univ. of Cal.*, 155 F. Supp. 3d at 39 (discussing the 1995 Final Rule). The 1995 Final Rule arose from the fact that, even though Congress had adopted the prospective payment system for the provision of inpatient hospital services, certain other services provided by hospitals were still being reimbursed under the "reasonable costs" methodology—i.e., reimbursement payments were based on the costs "actually incurred" for the services rendered. 1995 Final Rule, 60 Fed. Reg. at 33,126; *see also Regents of the Univ. of Cal.*, 155 F. Supp. 3d at 39. Under the accrual basis of accounting, which governed how the expenses related to those other services were reported, providers were required to report expenses in "the period in which they are incurred, regardless of when they are paid." 1995 Final Rule, 60 Fed. Reg. at 33,126. But the Secretary had noticed a problem: some providers were using that definition to claim costs "without evidence of having incurred actual expenditures or the assurance that liabilities associated with accrued costs w[ould] ever be fully liquidated through an actual expenditure of funds." *Id.*[5] To address this problem, the Secretary decided that

---

[5] For example, some providers were reporting, as expenses, sick-leave days that had vested with employees but that could still be subsequently forfeited, and thus may never be "paid" out. 1995 Final

the cost-reporting rules should be adjusted "to incorporate longstanding Medicare policy regarding timely liquidation of liabilities[.]"  *Id.* at 33,126; *see also id.* at 33,126–27 (explaining that the Medicare Provider Reimbursement Manual had long stated that providers who did not "timely liquidate" liabilities—however timely liquidation was defined for that particular liability—could not claim reimbursements for those costs).

Significantly for present purposes, when the Secretary first proposed the 1995 Final Rule, commenters complained that it would conflict with GAAP.  *Id.* at 33,127. In response, the Secretary explained that "Medicare payment policy does not always follow GAAP exactly because Medicare payment policy and GAAP have different objectives."  *Id.*  That is, while "Medicare's objective for cost payment purposes is to pay providers appropriately for the reasonable and proper cost of furnishing services to Medicare beneficiaries in a specific fiscal period[,]" the "primary goal of GAAP is the full and proper presentation of accounting data through statements and reports."  *Id.* Moreover, according to the Secretary, at least in this context, GAAP had to be subordinated to Medicare payment policy where the two conflict.  *See id.* at 33,128; *see also id.* ("The fact that Medicare payment policies may at times differ from GAAP is neither unusual nor unintentional.").  The Secretary also stressed that the agency was not saying that GAAP was irrelevant, but simply clarifying that GAAP could not be used to undermine Medicare policy.  *See id.* at 33,129 (explaining that, to comply, providers needed only to record their costs in accordance with GAAP and then "make

---

Rule, 60 Fed. Reg. at 33,126.

necessary reclassifications and adjustments in their Medicare cost reports to conform with Medicare policy").

The 1995 Final Rule was ultimately codified at 42 C.F.R. § 413.100, but it was explicitly made inapplicable to inpatient care that was subject to the PPS payment scheme. *See Regents of the Univ. of Cal.*, 155 F. Supp. 3d at 39 (citing, *inter alia*, 1995 Final Rule, 60 Fed. Reg. at 33,126); *see also* 1995 Final Rule, 60 Fed. Reg. at 33,126 ("This policy pertains to all services furnished by providers *other than inpatient hospital services* . . . and certain inpatient routine services furnished by skilled nursing facilities[.]" (emphasis added)). Thus, between 1995 and 2005, hospitals continued to report their wage-related costs in accordance with GAAP with respect to reimbursements for inpatient services, while the expenses that were not subject to the prospective payment system were reported only if they were timely liquidated.

### 2. The 2003 PRM Instruction And The 2005 Proposed Rule

In 2003, HHS attempted to address what the agency saw as potential wage-related reporting abuses by hospitals seeking reimbursement for inpatient services under the PPS system. The Secretary inserted a directive into one of the provider instructions in the Medicare Provider Reimbursement Manual ("the PRM"), which is a manual that "contains 'guidelines and policies to implement [the] Medicare regulations [that] set forth principles for determining the reasonable cost of provider services,' but . . . 'does not have the effect of regulations.'" *Catholic Health Initiatives v. Sebelius*, 617 F.3d 490, 491 (D.C. Cir. 2010) (quoting Ctrs. for Medicare and Medicaid Servs., Provider Reimbursement Manual, Part 1, Foreword, at I); *see also* 2005 Final Rule, 70 Fed. Reg. at 47,369 (noting that the Secretary's GAAP-related statement appeared in Part II of the PRM, at section 3605.2). The instruction stated that, "[a]lthough hospitals should use

15

GAAP in developing wage related costs, the amount *reported* for wage index purposes must meet the reasonable costs provisions of Medicare." *Regents of the Univ. of Cal.*, 155 F. Supp. 3d at 39 (emphasis added) (alteration in original) (internal quotation marks and citation omitted).

Then, on May 4, 2005, the Secretary went even further: in the proposed rule that introduced the wage index for federal fiscal year 2006, the agency outlined its "propos[al] to revise the Medicare hospital inpatient prospective payment systems . . . to implement changes arising from [HHS's] continuing experience with th[o]se systems." *Medicare Program; Proposed Changes to the Hospital Inpatient Prospective Systems and Fiscal Year 2006 Rates* ("2005 Proposed Rule"), 70 Fed. Reg. 23,306, 23,306 (May 5, 2005). The summary section of the 2005 Proposed Rule specifically mentioned the Secretary's intention to change "the amounts and factors used to determine the rates for Medicare hospital inpatient services for operating costs and capital-related costs." *Id.* And the summary also set forth a long list of proposed "policy changes[,]" including changes related to "wage data, including the occupational mix data, used to compute the wage index[.]" *Id.*

In a subsection of the 2005 Proposed Rule that was titled "Worksheet S-3 Wage Data for the Proposed FY 2006 Wage Index Update[,]" *id.* at 23,371, the Secretary recounted the 1994 Final Rule and explained that HHS had "instructed hospitals to use [GAAP] in developing wage-related costs for the wage index," in large part because the agency had believed that "the application of GAAP[] for purposes of compiling data on wage-related costs used to construct the wage index [would] more accurately reflect relative labor costs, because certain wage-related costs (such as pension costs), as

recorded under GAAP[], tend to be more static from year to year." *Id.* (quoting 1994 Final Rule, 59 Fed. Reg. at 45,357).  Since then, however, HHS had "periodically received inquiries for more specific guidance on developing wage-related costs for the wage index[,]" and in response, the agency had provided several attempted clarifications, including the 2003 PRM Instruction.  *Id.*  Nevertheless, the Secretary remained concerned about "inconsistent reporting and overreporting of pension and other deferred compensation plan costs," which was a problem that also had been highlighted in "an ongoing Office of Inspector General review[.]"  *Id.*; *see also Regents of the Univ. of Cal.*, 155 F. Supp. 3d at 40 ("In May 2005, the Office of Inspector General . . . alerted [the Secretary] to . . . preliminary findings regarding hospitals' inconsistent reporting of pensions and other postretirement benefit costs as wage data in their cost reports." (third alteration in original) (internal quotation marks and citations omitted)).  Therefore, the summary section of the 2005 Proposed Rule stated that

> we are clarifying in this proposed rule that hospitals must comply with the PRM, Part I, sections 2140[,] 2141, and 2142 and related Medicare program instructions for developing pension and other deferred compensation plan costs as wage-related costs for the wage index.  The Medicare instructions for pension costs and other deferred compensation costs combine GAAPs, Medicare payment principles, and other Federal labor requirements.  We believe that the Medicare instructions allow for consistent reporting among hospitals and for the development of reasonable deferred compensation plan costs for purposes of the wage index.
>
> Beginning with the FY 2007 wage index, hospitals and fiscal intermediaries must ensure that pension, post-retirement health benefits, and other deferred compensation plan costs for the wage index are developed according to the above terms.

2005 Proposed Rule, 70 Fed. Reg. at 23,371.  With this language, the 2005 Proposed Rule required hospitals to move away from the GAAP-only approach to reporting their

wage-related costs for wage-index purposes and to report those costs in accordance with "Medicare instructions," which are also known as "Medicare Reasonable Cost Principles," or "MRCP." (Admin. R. App. ("AR"), ECF Nos. 22-1–20, 960; Def.'s Mem. at 17.) The 2005 Proposed Rule also imposed a one-year lag with respect to the effective date of this change; only the Worksheet S-3 data that the agency would rely upon to construct the 2007 wage indices (and beyond) would need to comport with MRCP. *See* 2005 Proposed Rule, 70 Fed. Reg. at 23,371.

Thus, the Secretary proposed that MRCP govern what hospitals would report on their wage-data worksheets, as well as what the Secretary would accept with respect to those costs beginning in 2007, and explained that, by establishing this requirement, it was the agency's intention to support the development of a more accurate wage index based on consistent reporting of wage-related costs. *See id.* The Secretary received 555 written comments regarding the 2005 Proposed Rule during the public-comment period, only five of which expressed concern about the proposed changes related to the wage index. (*See* AR 306–08.)

3.  <u>The August 2005 Final Rule</u>

In the final notice that the agency published in the Federal Register on August 12, 2005, the Secretary addressed certain comments that HHS had received in response to the proposed wage-index-related changes. *See* 2005 Final Rule, 70 Fed. Reg. at 47,369–70. Two commenters complained that the reporting rule would be "a significant change" from the policy articulated in 1994 and that the agency had "provided no rationale for moving away from using GAAP for developing these costs for the wage index," 2005 Final Rule, 70 Fed. Reg. at 47,369, while another claimed that GAAP was simply superior to MRCP for these purposes, *see id.* In response, the Secretary again

explained the key differences between GAAP and MRCP, and reiterated the proposed

rule's reference to the 2003 PRM Instruction, which, as noted above, had previously

informed hospitals that "[a]lthough [they] must use GAAP in developing wage-related

costs, the amount reported for wage index purposes must meet the reasonable cost

provisions of Medicare." *Id.* The Secretary also articulated HHS's view that,

notwithstanding GAAP's benefits and the agency's statements about GAAP in 1994,

HHS had not intended "for hospitals to include costs in the wage index that ha[d] not

been funded and m[ight] never be funded[,]" which was a practice that, if unchecked,

could lead to significant distortions in the regional average wage calculation. *Id.* The

2003 PRM Instruction was one attempt to make this clear, but experience had

demonstrated the necessity of enacting a rule that prevented a GAAP-only approach to

filling out Worksheet S-3. *See id.* In addition, the Secretary's response to the

commenters specifically referenced the Inspector General's report—which had found

that "some hospitals include[d] millions of dollars in unfunded pension and other

postretirement benefit costs," while others "include[d] only funded amounts," thereby

distorting the wage index—and explained that requiring MRCP (which, again, did not

render GAAPs irrelevant but merely "combine[d] GAAPs, Medicare payment

principles, and Department of Labor and Internal Revenue Service requirements")

would fix that problem. *Id.*

The 2005 Final Rule rejected the call for a new comment period, *see id.* at

47,370 (asserting that the "discussion in the proposed rule was sufficient notice"), and

ultimately adopted the proposed rule nearly verbatim, *see id.* at 47,369. The operative

language—which is almost exactly the same as the language of the proposed rule and differs only as indicated by the underlined portions below—is as follows:

> Due to recent questions and concerns we received regarding inconsistent reporting and overreporting of pension and other deferred compensation plan costs, as a result of an ongoing Office of Inspector General review, we are clarifying in this <u>final</u> rule that hospitals must comply with <u>the requirements in 42 CFR 413.100</u>, the PRM, Part I, sections 2140, 2141, and 2142, and related Medicare program instructions for developing pension and other deferred compensation plan costs as wage-related costs for the wage index. The Medicare instructions for pension costs and other deferred compensation costs combine GAAPs, Medicare payment principles, <u>and Department of Labor and Internal Revenue Service requirements</u>. We believe that the Medicare instructions allow for both consistent reporting among hospitals and for the development of reasonable deferred compensation plan costs for purposes of the wage index.

*Id.* at 47,369 (emphasis added).[6]  Furthermore, in addition to restating the MRCP reporting requirement, the 2005 Final Rule also reiterated that the MRCP requirement would not go into effect until fiscal year 2007.  *See id.*  In this regard, the Secretary explained that all regulated parties should be able to comply with the requirement by fiscal year 2007, because "hospitals have been required, since cost reporting periods beginning during FY 1995, to complete . . . a reconciliation worksheet between GAAP and Medicare principles[,]" *id.* at 47,370, and, apparently, "[w]hen combined with wage costs included on Worksheet S-3," this reconciliation worksheet "provided a basis to

---

[6] The underscored language is the only difference between the operative language of the 2005 Proposed Rule and that of the 2005 Final Rule.  The requirements in 42 C.F.R. § 413.100 are the timely liquidation principles that the Secretary said applied to certain healthcare providers that were not subject to the prospective payment system.  *See* 42 C.F.R. § 413.100(a) (providing that the "[p]rinciple" therein is the "accrual basis of accounting" under which "expenses are reported in the period in which they are incurred"); *id.* § 413.100(c)(1) ("[F]or purposes of payment Medicare does not recognize the accrual of costs unless the related liabilities are liquidated timely.").  The reference to the Department of Labor and Internal Revenue Service requirements replaced the proposed rule's reference to "other Federal labor requirements[,]" 2005 Proposed Rule, 70 Fed. Reg. at 23,371, and thereby provided an additional (and more specific) example of MRCP's scope.

determine which pension costs were timely liquidated in compliance with 42 C.F.R. § 413.100, without requiring further reporting[,]" *Regents of the Univ. of Cal.*, 155 F. Supp. 3d at 40–41.

Thus, per the 2005 Final Rule, MACs would need to examine the previously submitted cost-report data upon which future wage indices would be based to ensure that it complied with MRCP as part of their auditing process beginning in fiscal year 2007. *See id.* at 40–41, 45–46. And when it came time to begin the wage-index creation process for the 2007 regional wage indices (and the subsequent wage indices that necessarily relied on data from cost reports submitted before the 2005 Final Rule), the MACs did just that. *See id.* at 46 (explaining that the "fiscal intermediaries . . . adjust[ed] previously submitted data for purposes of computing the . . . 2007 and 2008 wage indices"). Furthermore, the Secretary also conducted her usual scrubbing process, followed by proposing the wage indices, and then promulgating them in a final rule. *See, e.g.*, FFY 2007 PPS Changes, 71 Fed. Reg. at 48,015 (describing, among other things, the post-intermediary removal of data from over two hundred hospitals).

Consequently, when the wage indices for fiscal year 2007 through 2010 were constructed (using cost-report data from prior years, as usual) and then used to determine individual hospitals' PPS payments, the accounting adjustment that the 2005 Final Rule required impacted the payments that hospitals received for those fiscal years. (*See, e.g.*, Pls.' Mem. in Supp. of Pls.' Mot. ("Pls.' Mem."), ECF No. 14-1, at 9 ("[The Secretary] . . . began applying [the 2005 Final Rule] when reviewing hospitals' 2003–2006 cost reports for purposes of determining wage ind[ices] for [fiscal years] 2007–2010."); *see also* Compl. ¶¶ 42–43 (alleging that "at the time [Plaintiffs] filed their

respective cost reports for fiscal years 2003–2006, they were operating under the guidance of the [1994 Final Rule]" and "would have made different decisions" if they had known the 2005 Final Rule was coming).)[7]

### 4. Transmittal 436 And The 2009 Spreadsheet

After it promulgated the 2005 Final Rule, HHS took two additional steps that are relevant here. First, in March of 2008, the Secretary decided to amend the PRM to address user confusion regarding the reporting of pension costs. Via a memorandum dubbed "Transmittal 436," the Secretary noted that the PRM "defines pension costs using ERISA terminology and the ERISA minimum and maximum cost limits[,]" and that the agency was replacing the GAAP-related terms that appeared in parts of the PRM with ERISA terms, in order "to prevent confusion with pension costs determined for financial accounting purposes." (AR 1112.) The Secretary explained that these "clarifications" were meant "to state the original intent of the manual on how to report pension costs." (*Id.*) However, according to Plaintiffs, prior HHS rules "did not specifically require the use of 'ERISA' . . . for purposes of reporting pension costs" when they "prepared their respective cost reports for [fiscal years] 2005–2007[.]" (Compl. ¶ 47.) Plaintiffs complain that, after Transmittal 436 issued, "[s]ome [MACs] began applying the guidance set forth in . . . Transmittal 436 to hospital cost reports for [fiscal year] 2005 for purposes of making [fiscal year] 2009 wage index determinations." (Pls.' Mem. at 18; *see also* Compl. ¶ 48 (alleging that, in the wake of

---

[7] Elsewhere in the complaint, Plaintiffs describe the cost reports with which they are concerned as those prepared for fiscal years 2002–05. (*See* Compl. ¶ 70.) This discrepancy is unexplained, and does not reappear in the briefing. (*See, e.g.*, Pls.' Mem. at 17 (describing the affected cost reports as beginning in fiscal year 2003).) In any event, as far as the Court can tell, this discrepancy does not affect the disposition here.

Transmittal 436, "some [MACs] changed the methodology by which they determined pension costs includable for purposes of the [fiscal year] 2009, 2010, and 2011 wage indices").)[8]

Second, in 2009, HHS released to the MACs an optional spreadsheet that could be used to assist in the auditing of wage-index data.  (*See* Pls.' Mem. at 19; Def.'s Mem. at 27.)  Plaintiffs allege that not all of the intermediaries used the optional spreadsheet, and those that did use the document did so to differing degrees, which, Plaintiffs say, altered the wage indices and necessarily affected Plaintiffs' PPS payments.  (*See* Pls.' Mem. at 19–20; Compl. ¶¶ 50–53.)

### C. Procedural History

The plaintiffs in the instant action are 493 hospitals from all over the United States that brought a consolidated administrative proceeding before the Provider Reimbursement Review Board ("PRRB") to challenge the PPS payments they had received during federal fiscal years 2007 through 2011.  (*See* Providers' Final Position Paper, AR 942–45.)  The Medicare statute authorizes hospitals to petition the PRRB, which is a tribunal within HHS, regarding PPS determinations, *see* 42 U.S.C. § 1395*oo*(a)–(b); 42 C.F.R. §§ 405.1803(a)–(b), 405.1811(a)–(b), and under certain circumstances, aggrieved providers can also seek judicial review of final agency decisions on such matters, *see* 42 U.S.C. § 1395*oo*(f); *see also Palisades Gen. Hosp.*, 426 F.3d at 401–02.

---

[8] Just as with Plaintiffs' description of the 2005 Final Rule, there is an intra-complaint discrepancy; Plaintiffs sometimes describe the affected cost reports as those created for fiscal years 2006 through 2008.  (*See* Compl. ¶ 71.)  Again, the discrepancy is not repeated in the briefing (*see, e.g.*, Pls.' Mem. at 18), and is of no moment here.

In their proceedings before the PRRB, Plaintiffs claimed that the PPS reimbursements they had received were unsatisfactory and contrary to law because of the effects of the rule changes that the Secretary had made with respect to the wage indices.  In chief, Plaintiffs homed in on the way that their MACs had adjusted Plaintiffs' reported labor-related costs during the auditing process after the 2005 Final Rule became effective.  (*See* Providers' Final Position Paper, AR 942 ("This . . . appeal is brought . . . to challenge . . . reductions in [certain hospital-reported expenses] utilized to determine the relevant wage indices for five federal fiscal years[.]"); *id.* 944–45 ("The exclusion of [certain] expenses from the Wage Data resulted in wage indices . . . which were not reflective of the national average wage level . . . adversely impact[ing] . . . [PPS] payments[.]"); Pls.' Mem. at 10 ("[Y]ears after the hospitals reported their [costs], some [administrative contractors] disallowed these expenses based upon the Secretary's *post hoc* policies."); *see also* PRRB Decision, AR 11 ("The parties dispute the amount of the pension and postretirement benefit . . . costs that should be reported on Worksheet S-3 for purposes of the wage index . . . . [The hospitals dispute] the computation of the wage indices for federal fiscal years . . . 2007 through 2011[.]").)

As relevant here, Plaintiffs argued to the PRRB that the 2005 Final Rule required *meaningful* notice and comment, and that such had not been afforded when the 2005 Final Rule was promulgated (*see* AR 205, 945); that the agency's rationale for moving away from GAAP in the 2005 Final Rule was insufficiently explained (*id.* 212); that Transmittal 436 was an interpretive guideline that required notice and comment because it had changed a previous position of the agency (*id.* 204–05, 217, 955–56); that the

agency had acted in an impermissibly retroactive fashion in establishing these new policies (*id.* 945); and that the MACs had calculated wage-related costs in a disparate way due at least in part to inconsistent use of the Spreadsheet (*id.*).  The PRRB viewed the case as "a dispute over the proper amount of Medicare reimbursement due" that turned on "[w]hether the [MACs'] adjustments to pension costs . . . resulted in erroneous wage indices[,]" and so construed, rejected Plaintiffs' challenge on the grounds that Plaintiffs' notice-and-comment claims lacked merit, and that the PRRB lacked the authority to consider Plaintiffs' retroactivity arguments.  (PRRB Decision, AR 1, 8.)  The PRRB also stated that, because the 2005 Final Rule was valid, it would not reach Plaintiffs' arguments that the 2005 Final Rule was "arbitrary and capricious and/or inconsistently applied[.]"  (*Id.* 18 & n.46.)  Thereafter, in a letter dated November 13, 2013, the CMS Administrator declined to review the PRRB ruling.  (*See id.* 1.)

Having exhausted their administrative remedies, Plaintiffs filed the complaint in the instant case on November 8, 2013.[9]  Plaintiffs' four-count complaint alleges, first, that the Secretary failed to comply with the APA's notice-and-comment requirements when the agency issued the 2005 Final Rule.  (*See* Compl. ¶¶ 54–60 (Count I).)[10]  The complaint further claims that the Secretary violated the APA in issuing Transmittal 436 because the Secretary changed agency policy in that document without engaging in notice-and-comment rulemaking (*see id.* ¶¶ 61–66 (Count II)); that the Secretary acted

---

[9] Plaintiffs were authorized to do so with respect to the questions that the PRRB passed on and also the matters over which it claimed to lack authority.  *See* 42 U.S.C. § 1395*oo*(f)(1) (providing that healthcare providers may obtain direct judicial review of a MAC's action if it "involves a question of law or regulations relevant to the matters in controversy"); *see also Regents of the Univ. of Cal.*, 155 F. Supp. 3d at 42.

[10] Plaintiffs' complaint calls the 2005 Final Rule the "2006 Pension Policy."  (Compl. ¶ 40.)

in an impermissibly retroactive manner (*see id.* ¶¶ 67–77 (Count III)); and that the

Secretary violated the Medicare statute because the agency's agents failed to act

uniformly in gathering data for the wage indices, and thus the resulting indices did not

comply with the statutory mandate that they "reflect" the regional hospital wage level

relative to the national wage level (*see id.* ¶¶ 78–81 (referencing 42 U.S.C.

§ 1495ww(d)(3)(E)(i)) (Count IV)).

As for the remedy, Plaintiffs ask this Court to declare both that the 2005 Final

Rule and Transmittal 436 were illegally issued because HHS flouted the required

rulemaking procedures, and that the change in the 2005 Final Rule and the MACs

application of the 2009 Spreadsheet constituted "impermissible retroactive rule-

making."  (Compl., Prayer for Relief, ¶¶ A–D.)  Plaintiffs also request that this Court

find that the MACs "failed to treat . . . pension costs in a consistent and uniform

manner for purposes of determining wage indices for [fiscal years] 2007 – 2011,"  and

that the Secretary's determinations of "pension costs for wage index purposes . . . was

arbitrary and capricious, an abuse of discretion and/or not in accordance with the law."

(*Id.* ¶¶ E–F.)  Accordingly, Plaintiffs maintain that this Court should "order the reversal

of the audit adjustments" the MACs made to the pension costs for wage index purposes

and order the Secretary to "recalculate [the] wage indices for [fiscal years] 2007–2011

using GAAP[]" and to "adjust [Plaintiffs'] respective [PPS] reimbursements[s] . . .

accordingly."  (*Id.* ¶¶ G–H.)

Plaintiffs filed a motion for summary judgment on September 5, 2014, and

Defendant filed a cross-motion for summary judgment on November 5, 2014.

Plaintiffs' motion reiterates their conviction that their PPS reimbursements for fiscal

years 2007 through 2011 were insufficient because they were based on defectively constructed wage indices and had an impermissibly retroactive effect. (*See* Pls.' Mem. at 23–35.) The Secretary's cross-motion counters that all of its actions adhered to notice-and-comment procedures where applicable, that the 2005 Final Rule reasonably interprets the Medicare statute, and that the 2005 Final Rule is not impermissibly retroactive. (*See* Def.'s Mem. at 32–51.) This Court held a hearing on both motions on May 12, 2015.

## II.   LEGAL STANDARD

The judicial-review provisions of the Administrative Procedure Act, 5 U.S.C. §§ 701–706, govern this Court's evaluation of final agency decisions concerning Medicare reimbursement. *See* 42 U.S.C. § 1395*oo*(f)(1). Although "[s]ummary judgment is the proper mechanism for deciding, as a matter of law, whether an agency action is supported by the administrative record and consistent with the APA standard of review[,]" the Court's "limited role" in "reviewing the administrative record" makes the typical summary judgment standards inapplicable. *Styrene Info. & Research Ctr., Inc. v. Sebelius*, 944 F. Supp. 2d 71, 77 (D.D.C. 2013) (internal quotation marks and citations omitted). Instead, per the APA's judicial-review provisions, courts "hold unlawful and set aside agency action, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]" 5 U.S.C. § 706(2)(A). The system effectively creates a division of labor: "it is the role of the agency to resolve factual issues to arrive at a decision that is supported by the administrative record," and it is the Court's role to "determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make

the decision it did." *Styrene Info.*, 944 F. Supp. 2d at 77 (internal quotation marks and citations omitted).  In short, when a district court reviews agency action, it "sits as an appellate tribunal, and [t]he entire case on review is a question of law." *Id.* at 78 (alteration in original) (internal quotation marks omitted) (quoting *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001)).

Two general legal standards that are applicable to this Court's analysis of the instant issues warrant introduction here.  One relates to the "arbitrary and capricious prong" of 5 U.S.C. § 706(2)(A), which requires agencies to satisfy the strictures of "reasoned decisionmaking[.]"  *Nat'l Fuel Gas Supply Corp. v. FERC*, 468 F.3d 831, 839 (D.C. Cir. 2006).  When this issue is raised, courts must "ensure that [the agency] has examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made."  *Id.* at 839 (second and third alterations in original) (internal quotation marks and citations omitted); *see also Fox v. Clinton*, 684 F.3d 67, 74–75 (D.C. Cir. 2012) ("To survive arbitrary and capricious review, an agency action must be the product of reasoned decisionmaking." (citations omitted)).  Under this "very deferential" standard, *Van Hollen, Jr. v. FEC*, 811 F.3d 486, 495 (D.C. Cir. 2016), courts "presume the validity of the agency's action[,]" *Grid Radio v. FCC*, 278 F.3d 1314, 1322 (D.C. Cir. 2002), and may not "substitut[e] [their] judgment for that of the agency[,]" *Van Hollen, Jr.*, 811 F.3d at 495.

Plaintiffs also sometimes complain that a particular agency action required notice-and-comment procedures, but the agency failed to provide them.  The Medicare statute contains a dedicated notice-and-comment provision.  *See* 42 U.S.C. § 1395hh(b);

*see also Clarian Health*, 2016 WL 4506969, at *10.  But not all kind of agency actions

are subject to the notice-and-comment process; for example, the Medicare Act

specifically exempts "interpretive rules"—as the APA defines them—from the notice-

and-comment requirement.  *See Monmouth Med. Ctr. v. Thompson*, 257 F.3d 807, 814

n.2 (D.C. Cir. 2001); *Clarian Health*, 2016 WL 4506969, at *10 ("[T]he Medicare

statute . . . import[s] the APA's exemption for interpretive rules[.]" (citation omitted));

*see also* 5 U.S.C. § 553(b)(A) (exempting "interpretative rules" from notice and

comment).  Furthermore, the question of whether an agency action required notice-and-

comment rulemaking is a pure question of law that does not require any special

"deference . . . to an agency's characterization of its own rule." *Clarian Health*, 2016

WL 4506969, at *9 (citation omitted); *see also Otsuka Pharm. Co. v. Burwell*, No. 15-

1688, 2016 WL 4098740, at *8 (D.D.C. July 28, 2016).

   Because the notice-and-comment process is intended to ensure that the public has

a fair chance to be heard on a proposed decision, in the mine-run APA case in which

notice-and-comment procedures are required, the notice is deemed defective if it does

not "include sufficient detail on its content and basis in law and evidence to allow for

meaningful and informed comment[.]" *Am. Med. Ass'n v. Reno*, 57 F.3d 1129, 1132

(D.C. Cir. 1995).  And once the public's comments are submitted and the agency

reviews them, the resulting final rule must not stray too far from the rule that the

agency proposed. *See Air Transport Ass'n of Am. v. C.A.B.*, 732 F.2d 219, 224 (D.C.

Cir. 1984) ("An agency adopting final rules that differ from its proposed rules is

required to renotice when the changes are so major that the original notice did not

adequately frame the subjects for discussion[.]" (citation omitted)).  That is, "[w]hile an

agency may promulgate final rules that differ from the proposed rule," a final rule must be the "logical outgrowth of [the] proposed rule[.]" *Int'l Union, United Mine Workers of Am. v. Mine Safety & Health Admin.*, 407 F.3d 1250, 1259 (D.C. Cir. 2005) (internal quotation marks and citation omitted); *see also* Kevin M. Stack, *Interpreting Regulations*, 111 Mich. L. Rev. 355, 418 n.308 (2012) ("The logical outgrowth doctrine seeks to ensure meaningful participation in the notice-and-comment process." (citation omitted)); *cf.* 42 U.S.C. § 1495hh(a)(4) (imposing a logical-outgrowth requirement on Medicare regulations).

## III.   DISCUSSION

Much like the Medicare statute itself, Plaintiffs' claims in this Medicare action are "hardly a paragon of clarity." *Southeast Ala. Med. Ctr.*, 572 F.3d at 915.  At bottom, each of Plaintiffs' contentions appears to rest on the belief that the PPS payments Plaintiffs received for fiscal years 2007 through 2011 were calculated wrongly because the wage indices that the agency used to calculate those payments were tainted.  (*See, e.g.*, Compl. ¶ 14 ("This case arises from appeals which all involve a common basis for challenge to [the Secretary's] computation of wage indices[.]").)  And all of Plaintiffs' assertions, when boiled to bare essence, seem geared toward advancing the following two overarching arguments.

First, Plaintiffs maintain that the challenged regional wage indices that were used to calculate their PPS payments for fiscal years 2007 through 2011 were inherently defective.  Plaintiffs say this is so for a host of reasons; specifically, because (1) the pertinent wage indices were created pursuant to, and were affected by, the 2005 Final Rule and Transmittal 436, both of which were allegedly imposed without required

notice and comment; (2) the GAAP-related accounting change that the agency made in the 2005 Final Rule was not sufficiently explained; (3) the GAAP-related policy choice is itself contrary to the Medicare statute; and (4) the MACs acted erratically when evaluating wage data for the purpose of implementing the Secretary's rule changes, which caused the resulting wage indices not to reflect relative wage levels as the Medicare statute requires.  Plaintiffs' second line of attack is their assertion that, regardless of whether the 2005 Final Rule and Transmittal 436 were legally permissible, adopted properly, and applied consistently, the resulting wage indices had an impermissibly retroactive effect when applied to Plaintiffs, because they were constructed based on data from cost reports that the hospitals submitted prior to the critical rule changes.

For the reasons explained below, this Court finds that none of Plaintiffs arguments is persuasive, and that, to the contrary, the rule changes that the Secretary adopted were lawfully promulgated and sufficiently explained, and were not applied to Plaintiffs in an impermissibly retroactive manner.  As a result, this Court has granted summary judgment in favor of Defendant.

**A.    None Of The Agency Actions That Plaintiffs Say Violated The APA Or The Medicare Statute (And Thus Purportedly Caused HHS To Create And Apply Defective Regional Wage Indices) Actually Did So**

1.    <u>The Secretary Gave Meaningful Notice Of The Change The Agency Adopted In The 2005 Final Rule, Which Was A Logical Outgrowth Of The 2005 Proposed Rule</u>

Plaintiffs argue that the GAAP-related change that HHS articulated in the 2005 Final Rule was problematic (and, thus, so too were the subsequent regional wage indices that were used to calculate Plaintiffs' PPS payments) because HHS provided insufficient notice to the public regarding the rule change before it was adopted.  (*See*

Pls.' Mem. at 24 ("The Secretary failed to provide meaningful notice of rulemaking before changing the methodology for determining wage index pension expenses").)[11] As mentioned, the Medicare Act requires the Secretary to provide notice of a proposed rule and an opportunity to comment before the rule is adopted, *see* 42 U.S.C. § 1395hh(b)(1), and Plaintiffs here insist that HHS failed to meet this requirement, primarily because the 2005 Proposed Rule allegedly mischaracterized itself as a clarification of prior policy rather than a change in policy, and therefore lacked "sufficient detail on its content and basis in law and evidence to allow for meaningful and informed comment[,]" *Am. Med. Ass'n*, 57 F.3d at 1132. (*See* Pls.' Mem. at 23–28.)  For the reasons that follow, this Court concludes that even a cursory review of the 2005 proposed rule reveals that the agency fully satisfied the applicable notice-and-comment standards.

To begin with, the very first sentence of the relevant notice—i.e., the "summary" of the 2005 Proposed Rule—informed the reader that the Secretary was "proposing to *revise* the Medicare hospital inpatient prospective payment systems (IPPS) for operating and capital-related costs *to implement changes* arising from our continuing experience with those systems."  2005 Proposed Rule, 70 Fed. Reg. at 23,306 (emphasis added).  And the summary did not stop there.  It further warned that the proposed rule would "describe the proposed *changes* to the amounts and factors used to determine the rates for Medicare hospital inpatient services[,]" and that "[a]mong the policy *changes* that we are proposing to make are *changes relating to . . . the wage data*, including the occupational mix data, used to compute the wage index."  *Id.* (emphasis added).

---

[11] Notably, there is no dispute that the mandate that hospitals switch from pure GAAP to MRCP constituted a change in policy.  (*See, e.g.*, Def.'s Mem. at 32, 49; Pls.' Mem. at 24; AR 17–18.)

Moreover, when one turns to the content of the proposed rule itself, the fact that the agency was changing its policy regarding the way in which wage data was to be reported could not have been more explicit.  In the section titled "Worksheet S-3 Wage Data for the Proposed FY 2006 Wage Index Update[,]" the Secretary opened with a description of the status quo, as set forth in the 1994 Final Rule: "The [1994 Rule] discussed criteria for including . . . wage-relate costs.  In that discussion we instructed hospitals to use [GAAP] in developing wage-related costs for the wage index[.]"  *Id.* at 23,371.  An additional brief discussion of the original rationale for the GAAP-only rule followed, and then the proposed rule clearly transitioned to the proposed change:

> [W]e have periodically received inquiries for more specific guidance on developing wage-related costs for the wage index . . . . Due to recent questions and concerns we received regarding inconsistent reporting and overreporting and other deferred compensation plan costs, as a result of an ongoing Inspector General review, we are clarifying in this proposed rule that hospitals *must comply with the PRM, Part I, sections 2140[,] 2141, and 2142 and related Medicare program instructions for developing pension and other deferred compensation plan costs as wage-related costs for the wage index*. The Medicare instructions for pension costs and other deferred compensation costs combine GAAPs, Medicare payment principles, and other Federal labor requirements. We believe that the Medicare instructions allow for consistent reporting among hospitals and for the development of reasonable deferred compensation plan costs for purposes of the wage index.

*Id.* (emphasis added).  The 2005 Proposed Rule further highlighted the fact that this new directive was a break from the past insofar as the agency did not require that "hospitals and fiscal intermediaries . . . ensure that pension, post-retirement health benefits, and other deferred compensation plan costs for the wage index are developed in accordance with the above terms" *immediately*; instead, the proposal expressly provided a one-year lag time before this new requirement is to take effect.  *See id.*

Thus, Plaintiffs' suggestion that the notice HHS provided amounted to an impermissible "bureaucratic game of hide and seek[,]" *MCI Telecomms. Corp. v. FCC*, 57 F.3d 1136, 1142 (D.C. Cir. 1995), rings hollow.

Undaunted, Plaintiffs insist that the 2005 Proposed Rule gave insufficient notice of the change that the agency was making because the agency asserted that it was "clarifying" its policy on the GAAP issue, 2005 Proposed Rule, 70 Fed. Reg. at 23,371—a representation that, to Plaintiffs, means that a reader must "divine the agency's unspoken thoughts" to ascertain with sufficient certainty that the Secretary was really making a change.  (Pls.' Mem. at 25 (internal quotation marks and citations omitted)); *see also Ariz. Pub. Serv. Co. v. EPA*, 211 F.3d 1280, 1299 (D.C. Cir. 2000) (noting that an agency provides insufficient notice if its proposed rule requires interested parties "to divine [the agency's] unspoken thoughts").  But the argument that HHS's use of the word "clarifying" hid the ball in an unacceptable manner can only be accepted if one ignores the fact that agency also (1) repeatedly and explicitly referenced "revis[ions]" and "changes [to] the wage data . . . used to compute the wage index"; (2) specifically directed that hospitals would henceforth have to submit wage data pursuant to Medicare program instructions that "*combin[ed]* GAAPs, Medicare payment principles, and other Federal labor requirements"; and (3) unmistakably decided to authorize a delay in implementation, thereby indicating the agency's belief that things were changing.  2005 Proposed Rule, 70 Fed. Reg. at 23,306, 23,371 (emphasis added). In this Court's view, these other statements and representations were more than sufficient to send a clear signal that the agency was making a regulatory change, even if the agency also perceived itself as "clarifying" its policy choice.

The D.C. Circuit's opinion in *Allina Health Services v. Sebelius*, 746 F.3d 1102 (D.C. Cir. 2014), which Plaintiffs cite and rely upon heavily, is not to the contrary.  In *Allina*, the D.C. Circuit reprimanded the Secretary of HHS for making a rule change under the ambit of a "proposal to clarify[,]" and here, Plaintiffs' emphasize the Circuit's statement that "the word clarify does not suggest that a potential underlying major issue is open for discussion."  746 F.3d at 1108; (*see* Pls.' Mem. at 24).  But a closer look at *Allina* reveals the circumstances that gave rise to this pronouncement, which are quite different from those presented here.

As background, in the *Allina* case, HHS had been called upon to decide whether Medicare Part C patients were—or were not—entitled to benefits under Medicare Part A; this determination, in turn, governed whether such beneficiaries' "patient days" were to be included in the "Medicare fraction," on the one hand, or the "Medicaid fraction," on the other.  *Allina Health Servs.*, 746 F.3d at 1105–06.[12]  Before 2003, the Secretary had treated Part C patients as *not* entitled to Part A benefits, but confusion had arisen regarding that policy's precise contours.  *Id.* at 1106.  In 2003, the Secretary issued a notice of proposed rulemaking that identified the confusion and stated in relevant part that the agency was "proposing to clarify" that Part C patients should *not* be treated as entitled to Part A benefits for the purpose of determining how their patient days were counted, *id.* (internal quotation marks and citation omitted)—i.e., the proposed rule merely reiterated the agency's prior long-standing policy that, because such beneficiaries were not entitled to Part A benefits, their patient days should be counted in the *Medicaid* fraction.  However, when it came time to promulgate the final rule, the

---

[12] Both fractions are used to calculate supplemental Medicare payments to hospitals that serve a disproportionate number of low-income patients.  *See Allina Health Servs.,* 746 F.3d at 1105–06.

agency announced that it was "adopting *the exact opposite interpretation*[,]" *id.* (emphasis added); that is, that Part C patient days should be counted in the *Medicare* fraction, because Part C patients *were*, in fact, entitled to Part A benefits, *see id.* The plaintiffs in *Allina* filed suit, alleging that the agency had failed to provide sufficient notice of the policy change, and given the circumstances, that was an argument with which both the district court and the D.C. Circuit agreed. *See id.* at 1111.

When viewed in context, then, *Allina*'s disapproving mention of the agency's use of the word "clarifying" is nothing more than the unremarkable observation that the agency's use of that term unfairly masked a true policy change (and thereby deprived the public of a meaningful opportunity to comment) under the circumstances presented in that case. Put another way, because the Secretary's longstanding practice before the proposed rule had been precisely what the agency had "propos[ed] to clarify[,]" *id.* at 1106, the proposed rule did not "suggest that the Secretary was thinking of reconsidering a longstanding practice," and the D.C. Circuit reasonably concluded that "[t]he hospitals should not be held to have anticipated that the Secretary's 'proposal to clarify' could have meant that the Secretary was open to reconsidering existing policy[,]" *id.* at 1108. To read *Allina* as Plaintiffs' do—i.e., as standing for the proposition that the mere appearance of the word "clarify" in a proposed rule makes it *per se* impossible for regulated entities to anticipate that a change is being made—goes much too far, and that is especially evident where, as here, the agency's proposed rule otherwise makes it abundantly clear that the policy being proposed is, in fact, a "change" and a "revision" of a previous rule. *See* 2005 Proposed Rule, 70 Fed. Reg. at 23,306.

This Court notes, too, that at least some of the commenters were not in fact deceived; they properly perceived the language in the 2005 Proposed Rule to be the change that HHS intended.  Plaintiffs are, in essence, making a "dog that did not bark" notice argument regarding the 2005 Proposed Rule's lack of clarity, *cf. Chisom v. Roemer*, 501 U.S. 380, 396 n.23 (1991) (citing A. Doyle, Silver Blaze, in the Complete Sherlock Holmes 335 (1927)), which might have been compelling if *no one* had noticed the policy shift.  But five commenters—four hospital conglomerates and a university— specifically objected to the very policy change that Plaintiffs say the word "clarifying" hopelessly obscured.  (*See* AR 306–08.)  And the D.C. Circuit has long treated the submission of relevant comments as evidence that sufficient notice was given.  *See, e.g.*, *Appalachian Power Co. v. EPA*, 135 F.3d 791, 816 (D.C. Cir. 1998) (observing that, although the proposed rule did not expressly propose the use of two technologies, the proposed rule solicited comments on the use of the technologies and that "[c]ommentors clearly understood that the[] technologies were under consideration, as the agency received comments on them from several sources" (internal quotation marks and citation omitted)).  Furthermore, the fact that only a relatively small number of interested parties deigned to comment on this issue (*see* Pls.' Mem. at 27) is not dispositive of the notice question; what matters most is whether the policy change was clear on the face of the proposed rule such that the agency provided the public with a fair opportunity to address it, *see MCI Telecomms. Corp.*, 57 F.3d at 1142; *see also Fla. Power & Light Co. v. United States*, 846 F.2d 765, 771 (D.C. Cir. 1988) (explaining that the agency's notice must "provide sufficient factual detail and rationale for the rule

to permit interested parties to comment meaningfully").  For the reasons discussed above, this Court easily concludes that such was the case here.

Finally, this Court also rejects Plaintiffs' related suggestion that, even if the 2005 Proposed Rule provided fair notice of the GAAP-related change in agency policy, Plaintiffs were denied a meaningful opportunity to comment on the rule that HHS ultimately adopted because the 2005 Final Rule was not a "logical outgrowth" of the 2005 Proposed Rule.  (*See* Pls.' Mem. 25–27.)  To be sure, the Secretary "may promulgate a rule that differs from a proposed rule only if the final rule is a 'logical outgrowth' of the proposed rule."  *Allina Health Servs.*, 746 F.3d at 1107 (quoting *Ass'n of Private Sector Colls. & Univs. v. Duncan*, 681 F.3d 427, 442 (D.C. Cir. 2012)).  But Plaintiffs have failed to demonstrate that the language in the proposed rule actually differed from that of the final rule in any meaningful respect, nor can they reasonably do so, given that the operative language in the 2005 Final Rule is almost a verbatim copy of the analogous language in the 2005 Proposed Rule, as explained above.  *See supra* Part I.B.1.b.  Plaintiffs suggest that the agency's insertion of "the requirements in 42 C.F.R 413.000" before "the PRM" in the 2005 Final Rule matters, *see* 2005 Final Rule, 70 Fed. Reg. at 47,369, but this addition to the final rule did not alter the substance of the change that the agency previously proposed.  Indeed, the 2005 Proposed Rule had made it clear that, unlike past practice, wage-related costs would need to be reported in accordance with MRCP, and section 413.100 of Title 42 of the Code of Federal Regulations established precisely that requirement for non-inpatient services, as explained, *supra*, in Part I.B.1.b.  Thus, the added reference to 42 C.F.R. § 413.100 changed nothing about the import of the rule; it simply served to elucidate

what the proposed rule had announced: that hospitals seeking reimbursement for inpatient services should understand, going forward, that MRCP's timely liquidation principles trumped GAAP.

In sum, when applicable, the notice-and-comment mandate requires only that the proposed rule provide "fair notice" such that "interested parties should have anticipated the agency's final course in light of the initial notice." *Owner-Operator Indep. Drivers Ass'n, Inc. v. Fed. Motor Carrier Safety Admin.*, 494 F.3d 188, 209 (D.C. Cir. 2007) (internal quotation marks and citations omitted); *see id.* at 210 n.7 (observing that the "crux of the logical outgrowth test" is "what was reasonably foreseeable" (quoting *Long Island Care at Home, Ltd. v. Coke*, 551 U.S. 158, 175 (2007))).  As explained above, this Court concludes that the 2005 Proposed Rule made crystal clear that the applicable standards were changing such that the GAAP-only approach to reporting wage data would no longer be countenanced, and Plaintiffs cannot reasonably contend that they lacked fair notice that MRCP would apply just because, in the nearly identical 2005 Final Rule, the Secretary decided to give a further example of what MRCP's application would mean by pointing to a closely related context.  Binding precedent has blessed far less in terms of notice.  *See, e.g.*, *Ariz. Pub. Serv. Co.*, 211 F.3d at 1299–1300 (holding notice sufficient where the EPA first proposed that Native American tribes be required to meet the "same requirements" as the States regarding judicial review of Clean Air Act permitting actions, even though the final rule exempted tribes from certain—but not all—requirements), *cited approvingly in Long Island Care*, 551 U.S. at 175.  Thus, this Court concludes that there was no notice-and-comment violation with respect to the

2005 Final Rule, much less a violation that would render subsequent wage indices necessarily tainted, as Plaintiffs maintain.

### 2. By Plaintiffs' Own Admission, Transmittal 436 Required No Notice And Comment

Plaintiffs devote an entire section of their complaint to attacking Transmittal 436 (*see* Compl. ¶¶ 45–49, 61–66), essentially on the gounds that, "[b]ecause Transmittal 436 effectuated a substantive change to . . . previous regulations and policy, notice and comment rulemaking was required" (*id*. ¶ 64). But Plaintiffs say almost nothing about this agency action in their motion for summary judgment. In a single cryptic paragraph entirely bereft of citations to legal authority, Plaintiffs appear to argue that by replacing lingering GAAP terminology in the PRM with ERISA terminology, Transmittal 436 somehow effected a further substantive change in policy. (*See* Pls.' Mem. at 28 (describing Transmittal 436 as "a complete departure from CMS' long standing mandate to use exclusively GAAP" and "inconsistent with the policy set forth in the [2006 Final Rule]").) But nowhere in the complaint or in the briefs do Plaintiffs explain how the alleged change in terminology amounted to a change in policy. As a result, Plaintiffs have waived this claim. *See XP Vehicles, Inc. v. U.S. Dep't of Energy*, 156 F. Supp. 3d 185, 192 n.2 (D.D.C. 2016) ("[P]erfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are deemed waived." (quoting *Johnson v. Panetta*, 953 F. Supp. 2d 244, 250 (D.D.C. 2013))).

Even more significant, Plaintiffs undercut their own argument that Transmittal 436 should have gone through notice-and-comment procedures by characterizing that document as "an interpretive guideline." (Pls.' Mem. at 28.) Plaintiffs' summary judgment motion argues that Transmittal 436 "was [improperly] issued without the

provision of notice and comment rulemaking" because it "was merely an interpretive guideline." (*Id.*)  This is no mere typo—Plaintiffs previously asserted to the PRRB that the transmittal was an "interpretive guideline" (AR 205), and argued to that tribunal that "[o]nce an agency gives a regulation an interpretation, it can only change the interpretation as it would formally modify the regulation itself through the process of notice and comment rule-making" (*id.* 409 (internal quotation marks omitted) (quoting *Paralyzed Veterans of Am. v. D.C. Arena*, 117 F.3d 579, 586 (D.C. Cir. 1997)); *see also id.* ("[HHS] failed to revise its previous interpretation through . . . notice and comment rule-making[.]")).  This argument is squarely based on the D.C. Circuit's *Paralyzed Veterans* doctrine, which an intervening Supreme Court decision has abrogated.  *See Perez v. Mortg. Bankers Ass'n*, 135 S. Ct. 1199, 1203 (2015).  The D.C. Circuit's *Paralyzed Veterans* case, 117 F.3d 579, had held that certain interpretive rules are subject to the APA's notice-and-comment requirements, *see id.* at 587–88, but the Supreme Court in *Perez* determined that interpretive rules are categorically exempt from notice-and-comment procedures, *see Perez*, 135 S. Ct. at 1206.[13]  *Perez* therefore spelled the end of that doctrine with respect to interpretive rules in the APA and Medicare statute contexts alike, *see Allina Health Servs. v. Burwell*, No. 14-cv-1415, 2016 WL 4409181, at *4–5 (D.D.C. Aug. 17, 2016) (recounting *Perez*'s overruling of *Paralyzed Veterans* in a discussion of the procedural requirements of the APA and

---

[13] Although *Perez* addressed interpretive rules under the APA, not the Medicare statute, *see* 135 S. Ct. at 1203, *Paralyzed Veterans*—the decision *Perez* expressly abrogated—was the D.C. Circuit's authority in both the APA context and the Medicare context.  *See Monmouth Med. Ctr.*, 257 F.3d at 814 (explaining that, because the Medicare statute imports the APA's distinction between substantive and interpretive rules, it likewise imported the *Paralyzed Veterans* doctrine).

Medicare Act), and thus Plaintiffs' acknowledgement here that Transmittal 436 was an interpretive rule dooms their argument that those procedures should have applied.

### 3. The 2005 Final Rule Was More Than Sufficiently Justified, And The Agency's MRCP Policy Choice Is Entitled To Deference

Next up are two related challenges to the 2005 Final Rule that, as far as this Court can tell, appear for the first time in Plaintiffs' summary judgment briefing. First, Plaintiffs argue that "[t]he Secretary did not acknowledge her departure from previous policy, much less provide a reasoned analysis for [her] policy change[.]" (Pls.' Mem. at 27.) This appears to be an assertion that the agency's explanation for ending the GAAP-only reporting policy failed the APA's reasoned-decision making requirements. *See* 5 U.S.C. § 706(2); *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 42–43 (1983). Those standards "require[], *inter alia*, that an agency adequately explain its action so that a reviewing court can 'evaluate the agency's rationale at the time of decision.'" *Van Hollen, Jr.*, 811 F.3d at 495 (quoting *Pension Benefit Guar. Corp. v. LTV Corp.*, 496 U.S. 633, 654 (1990)). Plaintiffs also maintain that, even if the agency's policy choice was sufficiently explained, its decision is contrary to "[c]ongressional [d]irectives and [a]gency [g]oals[.]" (Pls.' Mem. at 31–33.) The court notes that, as an initial matter, these two arguments are flawed from the get-go because they are conceptually distinct from any of the challenges to the 2005 Final Rule that Plaintiffs have alleged in the complaint. *See Budik v. Ashley*, 36 F. Supp. 3d 132, 144 (D.D.C. 2014) (explaining that parties may not amend complaints through briefing (citing *Larson v. Northrop Corp.*, 21 F.3d 1164, 1173–74 (D.C. Cir. 1994))). But even when they these attacks on the 2005 Final Rule are duly considered, they easily fail for the following reasons.

The first assertion—that the Secretary's "explanation for the rule change was intolerably mute" (Pls.' Mem. at 28)—is entirely baseless.  The text of the 2005 Final Rule demonstrates that HHS was acutely aware that it was announcing a change to its prior position regarding the use of GAAP when wage data is reported.  *See* 2005 Proposed Rule, 70 Fed. Reg. at 23,371 (describing the 1994 rule as background for its explanation of the agency's new reporting policy); 2005 Final Rule, 70 Fed. Reg. at 47,369 (same); *see also Arkema Inc. v. EPA*, 618 F.3d 1, 6 (D.C. Cir. 2010) (noting that, when an agency changes course, it need only "display awareness that it *is* changing position[,]" and that its "policy change [need not] be justified by reasons more substantial than those the agency relied on to adopt the policy in the first place" (emphasis in original) (internal quotation marks and citation omitted)).  What is more, as explained above, *see supra* Part I.B.2, HHS expressly proffered a series of reasons for shifting to MRCP.  Briefly, the agency explained that the old GAAP reporting system was causing "inconsistent reporting and overreporting of pension and other deferred compensation costs"; that an Inspector General report had indicated serious problems with the status quo; and that, in the agency's view, MRCP would help rectify those issues by "allow[ing] for consistent reporting among hospitals and for the development of reasonable deferred compensation plan costs for purposes of the wage index."  2005 Proposed Rule, 70 Fed. Reg. at 23,371; *see also* 2005 Final Rule, 70 Fed. Reg. at 47,369.  An agency's duty to explain its actions sufficiently requires no more, and Plaintiffs are simply wrong to suggest otherwise.  *See, e.g.*, *Anna Jaques Hosp.*, 583 F.3d at 224 (holding that HHS's explanation that it excluded certain hospitals' wage data from PPS wage index because those hospitals "have significantly different

labor costs" and "including them in [its] calculations would skew wage indexes" was sufficient).

Plaintiffs are also far off course when they assail HHS's substantive decision to implement Congress's directive that the wage index reflect regional wage levels by making the wage data that hospitals submit and that MACs analyze comport with MRCP standards.  (*See* Pls.' Mem. at 33 (arguing that "[u]nder GAAP, a stable expense figure is produced for a given year regardless of employer funding[,]" while "under other methods (including ERISA and MRCP), a hospital has the flexibility to compute labor costs under any of six different methods"—the prevalence of which varies geographically—and that "[t]his regional variation introduces volatility to the wage index, and thus undermines its stated purpose").)  Plaintiffs do not acknowledge that HHS has special expertise when it comes to deciding what form of wage data best generates "geographic comparisons of hospitals' labor costs" (*id.*), nor do Plaintiffs recognize that it is the longstanding policy of the federal courts to defer to an administrative agency's policy-making prowess under precisely the circumstances presented here, *see, e.g.*, *Anna Jaques Hosp.*, 583 F.3d at 224 (deferring to HHS's "expert view" that its chosen approach "would improve the overall equity of the wage index" (internal quotation marks and alteration omitted)); *see also Nat'l Cable & Telecomm. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 983 (2005) (noting that an agency is to be deemed "the authoritative interpreter (within the limits of reason)" of "an ambiguous statute [it] is charged with administering").

In fact, as Defendant points out (*see* Def.'s Mem. at 29–30, 32–33), Plaintiffs' argument that HHS's decision to switch to MRCP was "[i]nconsistent with

[c]ongressional [d]irectives" (Pls.' Mem. at 33) unquestionably implicates the well-worn two-step framework that the Supreme Court articulated in *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984).[14]  But Plaintiffs have not argued that Congress has spoken unambiguously to the question of whether GAAP or MRCP should apply, and courts have already held that Congress has not done so. *See, e.g.*, *Anna Jacques Hosp.*, 797 F.3d at 1164 (observing the lack of anything in the Medicare statute beyond "general guidance" regarding how the Secretary should construct the wage index); *Methodist Hosp. of Sacramento v. Shalala*, 38 F.3d 1225, 1230 (D.C. Cir. 1994) ("The statute does not specify how the Secretary should construct the index. . . . Congress through its silence delegated [that] decision[] to the Secretary.").  Plaintiffs have also failed to make the case that the agency's selection of MRCP rather than GAAP was unreasonable vis-à-vis the text or purpose of the Medicare statute, *see Pharm. Research & Mfrs. of Am. v. FTC*, 790 F.3d 198, 204 (D.C. Cir. 2015) (internal quotation marks and citation omitted); and, indeed, Plaintiffs' bald suggestion that the Court should apply its own policy preferences when evaluating the 2005 Final Rule indicates a lack of awareness of the deference that this Court must afford to the agency's determination (*see* Pls.' Mem. at 33 (inviting the Court to second-guess "the Secretary's decision to introduce MRCP into wage index" because, in

---

[14] In *Chevron*, the Supreme Court announced the applicable legal standard when a plaintiff attacks a regulation as contrary to a federal statute.  *See Flynn v. C.I.R.*, 269 F.3d 1064, 1069 (D.C. Cir. 2001). At Step One, courts ask whether "Congress 'has directly spoken to the precise question at issue,' in which case the court must give effect to that unambiguously expressed intent[.]"  *Nat'l Treasury Emps. Union v. Fed. Labor Rel. Auth.*, 414 F.3d 50, 57 (D.C. Cir. 2005) (quoting *Chevron*, 467 U.S. at 842–43).  But if the statute does not unambiguously resolve the question at issue, the court moves on to Step Two, pursuant to which the court is required to defer to the agency's determination, so long as it reasonably follows from a permissible construction of the statute.  *See Otsuka Pharm. Co.*, 2016 WL 4098740, at *14 ("At Chevron Step Two, this Court *must* accept a reasonable agency construction of a statutory provision, even if it 'differs from what the [C]ourt believes is the best statutory interpretation.'" (alteration in original) (quoting *Brand X*, 545 U.S. at 980)).

Plaintiffs' view, MRCP generates volatile indices that vary geographically in a manner that is inconsistent with "the statutory mandate that the wage index reflect relative labor costs across geographic areas and [the agency's] regulatory goal[s]")).

The bottom line is this: Plaintiffs are mistaken to insist that the 2005 Final Rule was arbitrary and capricious in violation of the APA because the agency's shift to MRCP standards was insufficiently explained and/or substantively wrong.  To the contrary, when the 2005 Final Rule is examined in the light of the required legal standards, this Court finds that nothing could be further from the truth.

    4.   <u>Plaintiffs Have Failed To Demonstrate That Inconsistent MAC Behavior Produced Wage Indices That Violated The Medicare Statute</u>

The final arrow in Plaintiffs' defective-wage-indices quiver is their assertion that the regional wage indices that were used to calculate Plaintiffs' PPS payments for fiscal years 2007 through 2011 were "arbitrary" (*id.* (internal quotation marks and citation omitted)) and did not properly reflect statutory mandates (*see* Compl. ¶ 81; *see also id.* ¶¶ 78–79), because the MACs applied the policies that the 2005 Final Rule and Transmittal 436 had adopted "in an inconsistent and sporadic manner" (Pls.' Mem. at 33; *see also id.* at 11 ("[T]he inconsistent methodologies used by the [MACs] to determine the hospitals' wage index Pension Expenses violates the Congressional mandate requiring a uniform wage index."); Compl. ¶ 80 (alleging disparate MAC behavior)).  In this regard, Plaintiffs assert that the agency's statutory mandate was to "'create a uniform picture of what wage levels were'" around the country (Pls.' Mem. at 34 (quoting *Centra Health, Inc. v. Shalala*, 102 F. Supp. 2d 654, 660 (W.D. Va. 2000))), but that goal was not achieved in practice because, "as a result of [the agency's] conflicting instructions, hospitals were not using a single, consistent

methodology to report Pension Expenses, and []MACs were not using a single

consistent methodology to review such Expenses" (*id.*).  Plaintiffs offer the testimony

of "an independent actuar[y]," who, according to Plaintiffs, was commissioned to

review data from the relevant period and identified "significant discrepancies in the

patterns of [Pension Expense] adjustments across the [MACs] and across years."  (*Id.*

(first alteration in original) (quoting AR 1149).)  However, what Plaintiffs do *not* do is

establish that those identified inconsistencies resulted in regional wage indices that

were so inherently defective that their construction and use must be deemed to have

violated the APA.

        This conclusion is based, first and foremost, on the well-established principle

that the Court must "presume the validity of the agency's action[.]"  *Grid Radio v.

FCC*, 278 F.3d 1314, 1322 (D.C. Cir. 2002) (internal quotation marks and citations

omitted).  Plaintiffs bear the burden of showing that the wage indices violated the

Medicare statute, *see Advocates for Highway & Auto Safety v. Fed. Motor Carrier

Safety Admin.*, 429 F.3d 1136, 1144 (D.C. Cir. 2005); *Regents of the Univ. of Cal.*, 155

F. Supp. 3d at 53, and a demonstration that there was inconsistent reporting or

evaluation of the data during the relevant period—alone—will not do, because the

Medicare statute does not mandate that HHS produce wage indices that capture regional

labor costs to a degree of scientific certainty; a "reasonable approximation[]" of

regional labor costs is all that is required, *Anna Jacques Hosp.*, 797 F.3d at 1165; *see

also Atrium Med. Ctr. v. U.S. Dep't of Health and Human Servs.*, 766 F.3d 560, 569

(6th Cir. 2014) (explaining that the "statute . . . does not mandate exactitude" (citing

*Methodist Hosp.*, 38 F.3d at 1230)).  This means that the bar is fairly low in terms of

the agency's statutory duty to produce wage indices that reflect relative wage levels, while, by contrast, the hurdle that Plaintiffs must overcome to demonstrate that the agency acted arbitrarily and capriciously with respect to developing the pertinent indices is quite high. *See Van Hollen, Jr.*, 811 F.3d at 495 ("[S]how[ing] the agency action is not a product of reasoned decisionmaking . . . is a heavy burden[.]" (internal quotation marks and citation omitted)).

This Court is confident that Plaintiffs have failed to clear that hurdle. For example, even assuming that various MACs treated the reporting and reviewing of wage data differently, and that this differential treatment amounted to disparate treatment of parties who were truly similarly situated in all relevant respects (which is hardly obvious), Plaintiffs have not explained *how* that disparate treatment with respect to the collection of wage data impacted the wage indices, much less demonstrated that the disparities were so egregious or the impact so great that the resulting wage indices became an unreasonably inaccurate reflection of relative wage levels nationwide. To rebut the presumption of validity that applies to the agency's actions, it is not enough to suggest that *any* suboptimal behavior on the MACs' part when applying the agency's rules *necessarily* demonstrates that the wage indices were irredeemably defective, nor will this Court accept that unproven assumption. *See Anna Jaques Hosp.*, 583 F.3d at 7 ("Unsupported allegations of arbitrary treatment are insufficient for [the Court] to render a judgment on the merits of such a claim."); *see also Regents of the Univ. of Cal.*, 155 F. Supp. 3d at 52 (rejecting challenge to inconsistent application of the 2005 Final Rule because plaintiffs' expert testimony "was based on speculation and inferences").

And it is especially important to reject the bald assumption that the alleged "pattern of inconsistency" in data reporting and review practices necessarily "violated the statutory mandate for the creation of a uniform wage index" (Pls.' Mem. at 35) where, as here, the record demonstrates that the "disparate treatment" of wage data by the hospitals and MACs (*id.*) was not the sole basis for the wage indices that the agency ultimately promulgated.  That is, as explained above, in order to produce the wage indices, HHS undertakes an extensive process in which it "scrubs" the data it receives from the hospitals.  *See Anna Jaques Hosp.*, 583 F.3d at 3.  This scrubbing process is over and above what the MACs do when they review the data in the first instance, and it often involves removing data that is "incomplete[,] inaccurate . . . , or otherwise aberrant," *id.* (citation omitted), including data that pertains to entire hospitals, *see, e.g.*, 2005 Final Rule, 70 Fed. Reg. at 47,372 (removing wage data for seven hospitals); *Medicare Program; Changes to Hospital Inpatient Prospective Payment Systems and Fiscal Year 2008 Rates* ("FFY 2008 PPS Changes"), 72 Fed. Reg. 47,130, 47,317 (Aug. 22, 2007) (removing data for thirty hospitals).  Thus, even if the hospitals and the MACs applied agency policy inconsistently in a manner that would otherwise have made the wage indices not reflective of labor costs, this Court sees no reason to assume that such problems remained uncorrected during the rigorous scrubbing process such that the ultimate wage index was irredeemably deformed—and Plaintiffs have offered none.  Thus, Plaintiffs have failed to carry their burden of demonstrating that the wage indices that were applied to them to generate PPS payments for fiscal years 2007 through 2011 were constructed arbitrarily and capriciously in violation of the APA. *See, e.g.*, *Regents of the Univ. of Cal.*, 155 F. Supp. 3d at 53 (concluding that PPS wage

index was not arbitrary and capricious because the plaintiffs "failed to offer any evidence about how the purportedly inconsistent application of the [2005 Final Rule] affected the accuracy of the wage index as a measure of relative labor costs").

To the extent that Plaintiffs' *real* concern is not defective indices but the MACs' allegedly inconsistent application of the 2005 Final Rule itself (*see, e.g.*, Pls.' Reply, ECF No. 18, at 15–16 (suggesting that the inconsistent application of the agency's policies, in and of itself, constitutes "arbitrary conduct [and] is a violation of the agency's legal mandate and an abuse of discretion")), this Court does not discern any such allegation in Plaintiffs' complaint.  Counts I and II—which are nominally brought under the APA—allege only that the agency failed to adhere to required notice-and-comment procedures.  (*See* Compl. ¶¶ 54–66.)  And while Plaintiffs do press application issues in their briefs in relation to Counts III and IV, Count III claims solely that the agency has applied its policies in an impermissibly retroactive fashion (*see id.* ¶¶ 67–77 (Count III)), and Count IV decries the lack of uniformity in the application of the agency's pension policies insofar as such disparities allegedly violate the Social Security Act (*see id.* ¶¶ 79–81 (Count IV)).  It is clear beyond cavil that the APA does not permit a "blunderbuss" complaint about "general deficiencies in compliance with broad statutory mandates[,]" *Banner Health v. Sebelius*, 797 F. Supp. 2d 97, 110–11 (D.D.C. 2011) (internal quotation marks omitted and citations omitted); a specific agency action must be challenged, and this Court sees no arbitrariness claim related to the application of the challenged agency policies in Plaintiffs' complaint.  *See Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 62, 64–66 (2004) (stressing that, because the APA contemplates review of "discrete" agency actions, a plaintiff must identify "some

particular agency action that causes it harm" and may not complain of "[g]eneral deficiencies in compliance" (internal quotation marks and citations omitted)). Consequently, Plaintiffs have forfeited any standalone claim that the MACs' inconsistent application of the policies HHS established in the 2005 Final Rule and Transmittal 436 was, in itself, arbitrary and capricious conduct that violated the APA. *See Wasco Prods., Inc. v. Southwall Techs., Inc.*, 435 F.3d 989, 992 (9th Cir. 2006) ("[S]ummary judgment is not a procedural second chance to flesh out inadequate pleadings." (internal quotation marks and citation omitted)); *see also 3E Mobile, LLC v. Global Cellular, Inc.*, 121 F. Supp. 3d 106, 108 (D.D.C. 2015) ("[A] complaint must . . . give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." (second alteration in original) (internal quotation marks omitted) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007))).

For all these reasons, Plaintiffs' have not made a colorable attack on the wage indices used to produce their PPS payments, and their myriad requests for summary judgment on the grounds that their PPS payments were calculated using defective wage indices must be rejected.

**B.  None Of The Agency's Actions Had An Impermissibly Retroactive Effect**

Plaintiffs have not only attacked the regional wage indices that were used to calculate Plaintiffs' PPS payments between 2007 and 2011 from the various angles discussed above, they have also claimed that HHS and its agents acted in an impermissibly retroactive manner when they applied the polices that the agency adopted in the 2005 Final Rule and Transmittal 436 to Plaintiffs, and also when some of the MACs employed the optional spreadsheet to calculate Plaintiffs' PPS payments.  (*See* Compl. ¶¶ 67–77.)  The fact that Plaintiffs fail to develop their retroactivity arguments

regarding Transmittal 436 or the spreadsheet in their summary judgment briefs makes quick work of this Court's task of evaluating those claims, which are most certainly waived. *See New England Anti-Vivisection Soc'y v. U.S. Fish & Wildlife Serv.*, No. 16-cv-149, 2016 WL 4919871, at *6 n.10 (D.D.C. Sept. 14, 2016) ("[A]n issue raised in the complaint but ignored at summary judgment may be deemed waived." (alteration in original) (citation omitted)); *Saunders v. Mills*, No. 11-cv-486, 2016 WL 1170924, at *13 (D.D.C. Mar. 24, 2016) (deeming waived a basis for summary judgment not raised in movant's principal brief). But even if the retroactivity claims related to those two agency actions had been sufficiently pursued, those claims would fail for the same reason that Plaintiffs' contention regarding the impermissibly retroactive application of the 2005 Final Rule cannot be sustained: because the agency's application of the 2005 Final Rule, Transmittal 436, and spreadsheet to evaluate wage data from cost reports that were submitted prior to the enactment of those policies was not impermissibly retroactive agency action, as explained below.

### 1. An Agency Can Alter The Future Legal Consequences That Attach To Past Actions Without Transgressing Retroactivity Principles

Although the "general legal principles governing retroactivity are relatively easy to state," they are "not as easy to apply." *Nat'l Min. Ass'n v. Dep't of Labor*, 292 F.3d 849, 859 (D.C. Cir. 2002) (per curiam). The basic thrust of the doctrine is that the government is prevented from applying new legal consequences to actions that have already occurred if—and *only* if—the government's action upends vested rights: a "provision operates retroactively when it 'impair[s] rights a party possessed when he acted, increase[s] a party's liability for past conduct, or impose[s] new duties with respect to transactions already completed.'" *Id.* (quoting *Landgraf v. USI Film Prods.*,

511 U.S. 244, 280 (1994)).  In the administrative context, "a rule is retroactive if it takes away or impairs vested rights acquired under existing law, or creates a new obligation, imposes a new duty, or attaches a new disability in respect to transactions or considerations already past."  *Id.* (internal quotation marks and citation omitted).  By contrast, if a regulated party's rights have not yet vested with respect to particular conduct—i.e., if the former legal consequences of his act have not attached before the rule change—the agency's application of a changed rule that alters the legal consequences of the prior conduct operates only prospectively.  *See Mobile Relay Assocs. v. FCC*, 457 F.3d 1, 11 (D.C. Cir. 2006) ("Retroactive rules 'alter[] the *past* legal consequences of past actions.'" (alteration and emphasis in original) (quoting *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 219 (1988) (Scalia, J., concurring))).

Determining whether the application of a rule is impermissibly retroactive "involves a commonsense, functional judgment about whether the new provision attaches new legal consequences to events completed before its enactment."  *Nat'l Min. Ass'n*, 292 F.3d at 860 (citation omitted).  It is well established that "administrative rules will not be construed to have retroactive effect unless their language requires this result."  *Quantum Ent'mt Ltd. v. U.S. Dep't of the Interior*, 714 F.3d 1338, 1342 (D.C. Cir. 2013) (internal quotation marks omitted) (quoting *Landgraf*, 511 U.S. at 264).  When applying this analysis, courts "first look to see whether [the rule] effects a substantive change from the agency's prior regulation or practice."  *Northeast Hosp. Corp. v. Sebelius*, 657 F.3d 1, 15 (D.C. Cir. 2011) (citation omitted).  The parties here agree that the 2005 Final Rule effected a substantive change (*see* Def.'s Mem. at 43; Pls.' Mem. at 28–29), and this Court concurs insofar as hospitals at least arguably had

certain cost-reporting options that were plainly foreclosed after the 2005 Final Rule. The second area of inquiry when evaluating the potential retroactive effect of a rule is that rule's "impact, if any, on the legal consequences of prior conduct." *Northeast Hosp. Corp.*, 657 F.3d at 14. If the new rule "alters only the *future* effect of past actions," it is not retroactive, but if it "alter[s] the *past* legal consequences of past actions," it is. *Id.* (emphasis altered) (alteration in original) (internal quotation marks and citation omitted). In other words, although a new rule may not "attach[] new legal consequences to events completed before its enactment," *id.* (internal quotation marks and citation omitted), there is no retroactivity objection if the rule simply "relies on facts drawn from a time antecedent to the enactment," *Regents of the Univ. of Cal.*, 155 F. Supp. 3d at 45 (internal quotation marks and citation omitted); *see also Landgraf*, 511 U.S. at 269 n.24 ("[A] statute is not made retroactive merely because it draws upon antecedent facts for its operation.").

    2.  <u>Far From Changing The Past Legal Consequences Of Past Actions, The 2005 Rule Merely—And Permissibly—Disrupted Expectations</u>

Clear and convincing precedents establish the fallacy of Plaintiffs' contention that the 2005 Final Rule and the Secretary's other wage-index related actions were applied in an impermissibly retroactive manner. Earlier this year, in the case of *Regents of the University of California v. Burwell*, 155 F. Supp.3d 31 (D.D.C. 2016), the U.S. District Court for the District of Columbia addressed a retroactivity argument that is indistinguishable from the one Plaintiffs seek to advance here. The plaintiffs in *Regents* were a group of hospitals that challenged the PPS payments they had received for fiscal years 2007 and 2008 on several grounds, including by asserting that "application of the 2005 [Final] Rule to the wage indices for [fiscal years] 2007 and

2008 constitutes impermissible, retroactive rulemaking." *Id.* at 43.  Just as in the

instant case, the plaintiffs complained that, in order to construct the wage indices for

2007 and 2008, HHS had employed the 2005 Final Rule to adjust wage data that the

plaintiffs had submitted to the agency before that rule was enacted.  *See id.* at 42

(noting the plaintiffs' argument that "the relevant cost data was generated before the

2005 [Final] Rule was adopted, and that application of the rule to that data constitutes

impermissible retroactive rulemaking").  In response to this retroactivity argument, the

*Regents* court explained clearly both why the 2005 Final Rule did not "operate

retroactively" when it was employed to evaluate the data that the agency used to

construct future wage indices, and how the plaintiffs' retroactivity argument actually

"misconceives the nature of the prospective payment system." *Id*. at 44.  The court's

explanation was firmly rooted in the purposes and function of the wage index and the

manner in which reimbursement payments are generated in the PPS system:

> The wage index for a particular fiscal year is used to calculate
> hospitals' compensation for wage-related costs that will be incurred
> to provide Medicare services in that fiscal year.  Thus, the FFYs 2007
> and 2008 wage indices were used to determine the amount of
> compensation hospitals would receive under the prospective
> payment system for services provided in those years.  The Secretary
> simply used historical data—including historical pension costs—to
> calculate the *prospective* payment rate. Although the Secretary's
> application of the 2005 [Final] Rule to evaluate historical pension
> costs from FYs 2004 and 2005 arguably changed the method used to
> make this prospective estimation, it did not alter the compensation
> that providers receive for services already provided.

*Id*. (emphasis in original).

This Court wholeheartedly agrees with the analysis and explanation of the

operation of the 2005 Final Rule that was set forth in the *Regents* case, and sees no

reason to deviate from that cogent discussion here.  Most notably, the *Regents* opinion

explained that, when properly understood, changes in the mechanism for calculating the wage index do not affect any vested right of the hospitals, because "[u]nder the PPS, the wage index is not used to reimburse providers for labor costs incurred in *earlier* years[; r]ather, those historical costs are used to determine a fair rate for *prospective* compensation." *Id.* (emphasis added).  Indeed, the treatment services that Plaintiffs performed and sought reimbursement for in fiscal years 2007 through 2011 had not even occurred when the 2005 Final Rule was enacted; therefore, the fact that HHS determined the rate of compensation for those post-2005 services based on data in cost reports that were submitted before the rule change does was not an impermissibly retroactive application of the 2005 Final Rule.  Put another way, far from divesting Plaintiffs of payments that the agency owed for services that the hospitals had already provided, the 2005 Final Rule merely altered what Plaintiffs might have expected to receive for the services that they tendered to beneficiaries once the rule was adopted. At most, then, the 2005 Final Rule changed the future legal consequences of the hospitals' present and future services, which is not the stuff of which impermissibly retroactive rulemaking is made.  *See Northeast Hosp. Corp.*, 657 F.3d at 14 (explaining that "[a] rule that alter[s] the past legal consequences of past actions is retroactive;" while one that "alters only the future effect of past actions . . . is not" (second alteration in original) (emphasis omitted) (internal quotation marks and citation omitted)); *see also, e.g.*, *Adm'rs of Tulane Educ. Fund v. Shalala*, 987 F.2d 790, 797–98 (D.C. Cir. 1993) (rejecting a retroactivity claim where, "[r]ather than altering [past] reimbursements," an HHS regulation only "permit[ted] the Secretary to use reaudited

versions of those past figures for the purpose of determining reimbursements in succeeding years").[15]

Plaintiffs' only response to this analysis is to insist that, had they known the change that the Secretary adopted in the 2005 Final Rule was coming, they "would have had an opportunity to make different funding decisions" when they submitted their cost reports for 2003 through 2005. (Pls.' Mem. at 31.)  But nothing in the law promised the permanent ossification of wage-index-calculation methods or bound the Secretary to continue to utilize a certain methodology for evaluating historical data when calculating future wage indices.  So Plaintiffs' argument is not so much a complaint that the 2005 Final Rule altered the "past legal consequences of past actions[,]" *Northeast Hosp. Corp.*, 657 F.3d at 14, as it is an assertion the Secretary changed the prospective *import* of their past actions/expenses, and, thereby, "upset[] expectations based on prior law[,]" *DIRECTV, Inc. v. FCC*, 110 F.3d 816, 826 (D.C. Cir. 1997) (internal quotation marks and citation omitted).  This line of argument is unavailing because, as explained above, an agency's disruption of a regulated party's expectations about how the law is likely to treat him in the future is not the same as its application of a new law to that party's past

---

[15] Recalling that PPS payments are made based on (1) the cost report that a hospital submits related to discharges in a given year and (2) the wage index in effect when the covered discharges occurred helps explain why this is so.  *See Regents of the Univ. of Cal.*, 155 F. Supp. 3d at 44; *see also* 2005 Final Rule, 70 Fed. Reg. at 47,368.  It is true that the wage indices about which Plaintiffs complain—those for federal fiscal years 2007, 2008, and 2009—were constructed based on data in cost reports submitted by hospitals for cost reporting periods beginning in federal fiscal years 2003, 2004, and 2005, respectively.  *See* FFY 2007 PPS Changes, 71 Fed. Reg. at 48,014; FFY 2008 PPS Changes, 72 Fed. Reg. at 47,316; *Medicare Program; Changes to the Hospital Inpatient Prospective Payment Systems and Fiscal Year 2009 Rates*, 73 Fed. Reg. 48,434, 48,581 (Aug. 19, 2008).  But the 2005 Final Rule did not alter in any way the PPS payments hospitals actually received for the discharges they made before that rule was adopted (in fiscal years 2003 through 2005); those payments had been made previously and were based on the wage indices in effect when the covered discharges therein occurred.  The 2005 Final Rule simply explained how the data in those reports would be treated when—for the first time—it was scrubbed and incorporated into a wage index that would be used to calculate PPS payments in the future.

conduct in an impermissibly retroactive manner.  *See Landgraf*, 511 U.S. at 269 n.24

(pointing to the example of "a new property tax or zoning regulation [that] may upset

the reasonable expectations that prompted those affected to acquire the property[,]" or

"a new law banning gambling [that] harms the person who had begun to construct a

casino before the law's enactment or spent his life learning to count cards[,]" and

noting that "[e]ven uncontroversially prospective [rules] may unsettle expectations and

impose burdens on past conduct").

    In short, as the *Regents* court aptly explained, the Secretary "applied the 2005

[Final] Rule only to establish prospective compensation rates for services not yet

provided[,]" and "did not engage in retroactive rulemaking by merely auditing or

drawing new conclusions from previously submitted, historical cost data in order more

accurately to establish future reimbursement rates—even if that data was previously

audited or used for the purpose of reimbursing providers for past services."  *Regents of*

*the Univ. of Calif.*, 155 F. Supp. 3d at 45, 46 (citing *Adm'rs of Tulane*, 987 F.2d at 797–

98).  This analysis is not only clearly correct, it also applies beyond Plaintiffs'

retroactivity argument with respect to the 2005 Final Rule and extends to the

substantially similar attacks that appear in Plaintiffs' complaint regarding Transmittal

436 and HHS's dissemination of a spreadsheet, which, as noted above, Plaintiffs fail to

develop in their summary judgment briefs.  (*See* Compl. ¶¶ 67–77.)  Plaintiffs have said

nothing to convince this Court that—even assuming *arguendo* that the arguments based

on Transmittal 436 and the spreadsheet were properly developed and that these agency

actions constituted a substantive change in agency policy—Transmittal 436 and the

spreadsheet "alter[ed] reimbursement rates for services already provided, amend[ed] the

rules applicable to past reimbursement periods, or [sought] to recoup amounts previously paid." *Regents of the Univ. of Calif.*, 155 F. Supp. 3d at 45.  Therefore, all of Plaintiffs' retroactivity claims fail.

## IV.    CONCLUSION

Plaintiffs' myriad attempts to establish that the regional wage indices that were used to calculate their PPS payments for fiscal years 2007 through 2011 were inherently defective miss the mark, for the reasons stated above.  Nor can Plaintiffs make a persuasive claim that the challenged agency actions were impermissibly retroactive. Accordingly, as provided in the Order this Court issued on September 30, 2015, Plaintiffs' motion for summary judgment has been **DENIED** and Defendant's cross-motion for summary judgment has been **GRANTED**.

DATE:  October 26, 2016

*Ketanji Brown Jackson*
KETANJI BROWN JACKSON
United States District Judge